**UNITED STATES of America, Appellee,**

v.

**John CODY, Defendant-Appellant.**

**Nos. 1211, 1609, Dockets 82–1428, 83–1100.**

United States Court of Appeals, Second Circuit.

Argued June 17, 1983.

Decided Nov. 28, 1983.

Lawrence H. Sharf, Brooklyn, N.Y., Sp. Atty. for the United States Attorneys Office, E.D.N.Y. (Raymond J. Dearie, U.S. Atty., E.D.N.Y., Edward A. McDonald, Attorney-in-Charge, U.S. Dept. of Justice, Organized Crime Strike Force, E.D.N.Y. and Michael A. Guadagno, Sp. Atty., Brooklyn, N.Y., of Counsel), for appellee.

Paul Windels, Jr., New York City (Charles L. Stewart, Craig P. Murphy, Georgina M. Guernica, Kim Davenport, of Windels, Marx, Davies & Ives, New York City, of counsel), for defendant-appellant.

Before OAKES and CARDAMONE, Circuit Judges, and BARTELS, District Judge.*

CARDAMONE, Circuit Judge:

The leader of a local Teamsters union appeals his conviction on charges based

---

* Honorable John R. Bartels, Senior Judge of the United States District Court for the Eastern District of New York, sitting by designation.

upon unlawful schemes he devised while serving as president of his local and trustee of its pension fund. The proof shows that he engaged in these schemes to enrich himself by means of extortion and kickbacks and through acceptance of valuable services from corporations that employed rank and file members of his local. A union representative is a fiduciary who may not feather his own nest at the same time he is supposed to be serving the union membership. As the facts of this case demonstrate, efforts directed toward such economic self-aggrandizement constitute not only a breach of trust, but serious criminal misconduct as well.

## I—BACKGROUND

This appeal stems from the judgment of conviction entered against John Cody in the United States District Court for the Eastern District of New York, following a jury trial held before Judge Jacob Mishler. Cody was convicted of violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) (Count I of the indictment), receiving illegal benefits from employers in violation of 29 U.S.C. § 186(b)(1) (Counts II, IV, V and VI), income tax evasion in violation of 26 U.S.C. § 7201 (Count VII) and filing a false tax return in violation of 26 U.S.C. § 7206(1) (Count VIII). He was found not guilty on Count III, another illegal benefit count. Appellant was sentenced to concurrent prison terms of five years on the RICO and tax evasion counts, three years on the false filing count and one year each on the illegal benefit counts. In addition, he was fined $25,000 on the RICO count, $10,000 on the tax evasion count and on each illegal benefits count, and $5,000 on the false filing count. Cody also appeals from a post-judgment order denying his motion for a new trial. After reviewing appellant's numerous contentions, we reverse as to Count II—one of the illegal benefit counts—and otherwise affirm the judgment of conviction and the order denying him a new trial.

## II—FACTS

Local 282 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America represents truck drivers who deliver building materials to construction sites throughout the New York metropolitan area and Long Island. The Local 282 Pension Trust Fund ("Pension Fund") is one of four employee benefit plans to which employers that have collective bargaining agreements with Local 282 contribute. During the entire time frame of events alleged in the indictment, Cody held significant salaried positions with both Local 282 and the Pension Fund, including President of the Local, trustee of the Pension Fund and Fund Manager.

The first offense under Count I involved three incidents that occurred during the construction of Cody's home in Southampton, New York from 1968 through 1970. One of the builders, Cody's old friend Herbert T. Schneider, owned a construction company that employed members of Local 282. The value of Schneider's services amounted to $6,653; however, prior to the grand jury investigation in November, 1981, Cody had paid only $1,900 of this amount. After Schneider reported to Cody that the grand jury inquiry related to this outstanding bill, Cody promptly paid him in full. One of the Schneider's subcontractors, Gallagher Service Corp., also performed substantial work on the house. Cody eventually tendered a check in part payment for these services but, at the same time, demanded that Gallagher kickback most of it. When Gallagher refused, Cody threatened him. Later, when Gallagher's employees voted to join Local 282, Gallagher went out of business. The final incident involving the Southampton home concerned an expensive driveway that cost the contractor, H.S. Roberts, Inc., $7,500 to install. Cody had asked one of the principals of Roberts for a "break" on the price and was told that although the company was too small to install the driveway without billing for it, it could probably do the job at cost. With this concession, Cody paid less than half of the contractor's costs, or $3,230.

In addition to these three incidents, the racketeering count encompassed two major kickback schemes arising from Cody's Pension Fund activities. The first occurred during 1969 and 1970 when the Fund's trustees arranged to purchase with Fund assets the Northampton Country Club. The Fund agreed to buy the golf club and adjoining acreage through Henry Norman, a part-time real estate agent and friend of the appellant. When Cody and another trustee learned that Norman's agency was to receive a $175,000 commission, they demanded a $60,000 kickback. At Cody's direction Norman paid $15,000 to Cody and $3,200 to the other trustee. The balance of the $60,000 kickback was invested in real estate. Four years later, under similar circumstances, Cody demanded and received another kickback from John Strong when the Fund purchased three parcels of undeveloped land referred to as "Pine Barrens." From Strong's commission of $700,000, Cody extorted $100,000.

All of these Count I charges, serving as predicate offenses for the RICO charge, occurred more than five years prior to the January 1982 indictment. To avoid statute of limitations problems the government also listed as predicate crimes Counts II through VI, each of which transpired within the five-year period. The jury convicted Cody on four of these counts—II, IV, V and VI—as well as on Count I. Counts IV, V and VI charged him with receiving free chauffeuring service from "no show" employees who were members of Local 282. The first chauffeur was Charles Daglia. He worked concurrently for Cody and, as teamster foreman, for the Carlin and Atlas Construction Company. Although Carlin and Atlas paid Daglia over $600 per week, he had no duties at the jobsite, so he was able to chauffeur Cody without any distractions. Later, Cody was chauffeured for substantial periods of time by Louis Ambrosio and Bruce Kay, both members of the Local who, like Daglia, drew their salaries from construction contractors while spending their working hours serving Cody.

Count II of the indictment charged that Cody received the rent-free use of a luxury apartment in North Shore Towers, near the boundary between Nassau and Queens. In 1971 Sigmund Somer Construction Company (Somer or Somer Construction) began building North Shore Towers. It did not have a contract with Local 282, nor did it employ any of the Local's members, although several subcontractors working on the project did. At trial, the government's only allegation of a nexus between Somer Construction and Local 282 was that Somer had plans to erect an office building in Manhattan that would be subject to a "high-rise construction" agreement between employers and Local 282. Due to the death of Sigmund Somer, these plans never came to fruition. In any event, the government proceeded to prove that Cody's mistress, Marilyn Taggert, had the rent-free use of the apartment from 1975 to 1977 and that Cody and Taggert each received free parking spaces in the Towers garage. The rental value of the apartment and garage spaces came to about $1,200 a month.

Perhaps the most damaging evidence with respect to the use of the rent-free apartment was Ms. Taggert's grand jury testimony which, over the strenuous objections of defense counsel, was read in her absence. The trial had originally been set to begin on June 7, 1982. Taggert successfully avoided service of a trial subpoena by fleeing to Europe. As a result, a continuance was granted until September in order to locate her, but these efforts were unavailing. It was in light of her untimely disappearance that Judge Mishler permitted the government to read her testimony into the record.

### III—RICO COUNTS

To establish Cody's guilt under the RICO count of the indictment the government had to prove that he committed at least two predicate offenses, 18 U.S.C. § 1961(5), one of which occurred within the five-year statute of limitations, 18 U.S.C. § 3282. *See United States v. Walsh,* 700 F.2d 846, 851 (2d Cir.1983). While the work on Cody's Southampton house and the kickbacks of real estate commissions from Strong and Norman charged seven predicate RICO of-

fenses indicating a pattern of racketeering activities, these events occurred beyond the five-year period of limitations. Thus, even though the jury found Cody guilty on six of the seven charges, his RICO conviction may be sustained only if one of the four offenses charged separately in Counts II, IV, V and VI—all of which occurred within five years of the indictment—is upheld.

Before undertaking to analyze the substance of these charges, it is helpful to put them in perspective by briefly reviewing the statutory development. Among the concerns addressed by the Labor Management Relations (Taft-Hartley) Act of 1947, Pub.L. No. 101, 61 Stat. 136, was the surfacing evidence of corruption, which § 302 of the Act, 29 U.S.C. § 186, was designed to meet. 1 C. Morris, *The Developing Labor Law* 37 (2d ed. 1983) (Morris). Later revelations before the McClellan Committee in 1957 uncovered even more evidence of serious abuses by a handful of certain union officials, precipitating amendments contained in the Labor Management Reporting and Disclosure (Landrum-Griffin) Act of 1959 Pub.L. No. 86–257, 73 Stat. 519. Morris at 49, 59; Aaron, *The Labor-Management Reporting and Disclosure Act of 1959,* 73 Harv.L.Rev. 851, 852–55 (1960). As the language of the amendments and their legislative history makes clear, Congress declared as its purpose in the Landrum-Griffin Act that labor officials serve as fiduciaries, 29 U.S.C. § 501, and act in accordance with "the highest standards of responsibility and ethical conduct in administering the affairs of their organizations," 29 U.S.C. § 401(a). Noting that using one's union office for personal financial advantage— playing both sides of the street—is a conflict of interest that corrupts and weakens the national labor movement, the legislative history accompanying the Landrum-Griffin Amendments states:

> For centuries the law has forbidden any person in a position of trust to hold interests or enter into transactions in which self-interest may conflict with complete loyalty to those whom they serve. Such a person may not deal with himself, or acquire adverse interests, or make any personal profit as a result of

his position. The same principle has long been applied to trustees, to agents, and to bank directors. It is equally applicable to union officers and employees.

S.Rep. No. 187, 86th Cong., 1st Sess., *reprinted in* 1959 U.S.Code Cong. & Ad.News 2318, 2330. Under the provisions of § 302 of the Taft-Hartley Act, it had been illegal for an employer to pay or deliver anything of value to a representative of his employees. 61 Stat. at 157. Section 505 of the Landrum-Griffin Act amended section 302 of the Taft-Hartley Act and broadened the scope of the proscription of "any payment" by an employer (with certain narrow statutory exceptions not here pertinent) and also forbid the receipt of any such payment by any person representing employees. *See* 1959 U.S.Code Cong. & Ad.News 2329. The amendment was designed to close some of the loopholes in the Taft-Hartley Act by punishing all forms of bribery and extortion in labor-management relations. *See id.* at 2330. Specifically, it recognized that some union officials were just as inclined to extort money as some employers were to give bribes. Thus, the activities engaged in here are precisely of a nature Congress sought to forbid. With this background in mind we turn first to Count II.

### IV—COUNT II

Cody's conviction on Count II was for accepting the rent-free use of an apartment from an employer in violation of the amended Taft-Hartley Act. As discussed, the Act makes it unlawful for an officer of a labor organization to receive or accept anything of value from someone who employs members of that labor organization. 29 U.S.C. § 186(b)(1) (1976). Appellant argues that his Count II conviction should be reversed and the charge dismissed because there was no existing employment relationship between Somer Construction and members of Local 282, as required by subsection (a) of the statute.

■ During the trial the government conceded that Somer Construction did not employ members of Local 282 during the time Cody and Taggert enjoyed use of the

North Shore Towers apartment. Nevertheless, it advanced two grounds for finding the payment unlawful. First, it argued that Somer Construction was a general contractor that had contractual relationships with its subcontractors, the employees of which were members of the local. Second, Somer Construction had plans to build an office building in Manhattan, which the government claims would have been covered by the "high-rise" agreement between Local 282 and employers that provided for exclusive use of union labor. Thus, the government concludes that there was a sufficient nexus between Somer Construction and Local 282 members, regardless of whether an employer-employee relationship existed.

The government's position finds little or no support in the language of the statute. Its argument linking Somer Construction to its subcontractors' employees is easily rejected. Congress provided that it was "unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section." 29 U.S.C. § 186(b)(1). Subsection (a) of § 186, in pertinent part, prohibits

> any employer or association of employers [from paying, lending or delivering] any money or other thing of value . . . (2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the *employees of such employer* who are employed in an industry affecting commerce . . . .

29 U.S.C. § 186(a) (emphasis supplied).

Whether the various subcontractors employed members of Local 282 is of no significance under the statute. The language specifically refers to the "employees of such employer," and the employer, Somer Construction, had no Local 282 members as its employees. Moreover, a literal reading of § 186 is entirely appropriate because it is consistent with the statute's purpose—to deter and punish the bribery of employee representatives by employers and the extortion of employers by employee representatives. *Arroyo v. United States,* 359 U.S.

419, 425–26, 79 S.Ct. 864, 868, 3 L.Ed.2d 915 (1959); 93 Cong.Rec. 4746 (1947); 92 Cong. Rec. 4893 (1946). The proof shows that Somer Construction had no direct relationship with Local 282 employees. Its relationship with its subcontractors' employees was too indirect to support the claim that Cody had sufficient leverage to extort from Somer or that Somer had any incentive to bribe Cody. Further, the threat of such statutory violations arising indirectly was even less likely in view of the fact that the subcontractors had completed their work on North Shore Towers prior to the time Cody and Taggart obtained the free use of the apartment.

The government's second argument on Count II—that Somer would have employed Local 282 members in the future—is equally unpersuasive. As noted, § 186(a)(2) refers to "the employees of such employer who are employed in an industry affecting commerce . . . ." This language requires an *existing* employment relationship, between the employer and members of the union, not the possibility of a future relationship. *See Chemical Workers v. Pittsburgh Glass,* 404 U.S. 157, 169, 92 S.Ct. 383, 392, 30 L.Ed.2d 341 (1971). To counter this point the government seizes on the surrounding language, which prohibits payments by an employer to the representative of a union that seeks to represent or "*would admit to membership,* any of the employees of such employers . . . ." 29 U.S.C. § 186(a)(2) (emphasis supplied). Relying on this conditional verbiage, the government argues that Somer and Cody violated the statute since Somer subsequently *would have* employed members of Local 282 if and when it built the Manhattan office building. Such a construction of § 186 is inconsistent with its purpose and with the facts of this case.

The legislative history reveals that subsection 186(a)(2) was added in 1959 for a specific reason—to deal with employers' attempts through bribery of union officials to block unionization of their *present* employees. *See* S.Rep. No. 187, 86th Cong., 1st Sess. 2, *reprinted in* 1959 U.S.Code Cong. & Ad.News 2318, 2329–30 (purporting to override the decision in *Ventimiglia v. United*

*States,* 242 F.2d 620 (4th Cir.1957)). In other words, the statute was designed to protect the possible future unionization of present employees, not, as here, the possible future hiring of present union members.

We recognize that there may be circumstances in which the possible future hiring of unionized workers might lead to abuses that § 186 was designed to prevent. But such is not the present case. Here, neither Somer Construction nor Sigmund Somer had ever employed a member of Local 282, nor was either a signatory to the high-rise agreement. In addition, there was no evidence that Somer or his company had actual plans to build the new building at the time he gave the apartment to Cody. Doubtless, the gift did not spring entirely from the kindness of Somer's heart, and perhaps it could be surmised that he hoped to obtain future goodwill from Cody, but the connection between Sigmund Somer Construction Company as an employer and Cody as an officer of Local 282 was too nebulous at the time the gift was made to be the basis for a criminal charge under § 186(b)(1).

Finally, the government's reliance on *United States v. Sink,* 355 F.Supp. 1067 (E.D.Pa.), *aff'd mem.,* 485 F.2d 683 (3d Cir. 1973), is misplaced. In *Sink,* there was no doubt that the employer was actively planning expansion into Philadelphia, where its present employees would have been admitted to the local union, and that the gift from the employer to the Philadelphia union representative was made at the time this expansion was being contemplated. Thus, the potential for a collective bargaining relationship between the employer and the union leader already existed, and it could be inferred that a motive for the gift was to discourage efforts to organize the employer's workers. As already noted, it is this type of corruption that the framers of § 186 sought to deter, quite unlike the instant case where the plans were unformed and the friendly relationship was one not then fairly susceptible to a more disparaging interpretation. Accordingly, the conviction under Count II must be reversed.

## V—COUNTS IV, V AND VI

Counts IV, V and VI of Cody's indictment were for receiving free chauffeuring service from construction company employees, in violation of 29 U.S.C. § 186(b)(2). Cody asserts that his conviction under these counts should be reversed because the government failed to prove that the employers had intentionally given the services of their employees to him and, further, because the trial court erroneously instructed the jury on this charge. Additionally, he claims that the employees themselves—not their employers—made a gift of their services. We find these arguments unpersuasive for the following reasons.

As noted, § 186(b)(1) proscribes the *receipt* by a union official of payments prohibited in § 186(a). Section 186(a), in turn, makes it unlawful for an employer to pay, lend or deliver anything of value to a union official representing his employees. In discussing the Taft-Hartley Act of 1947 the Supreme Court observed that nothing in the similar language of that Act (§ 302(a), (b)) "requires mutuality of guilt for the conviction of either the employer or the representative of employees." *Arroyo v. United States,* 359 U.S. at 423, 79 S.Ct. at 867. An employer might be guilty or a representative of employees might be guilty or both might be guilty. *Id.* at 423–24, 79 S.Ct. at 867. Plainly, the employer's purpose for making a payment is irrelevant since all payments, aside from those statutorily excluded, are unlawful. *See United States v. Ricciardi,* 357 F.2d 91, 99 (2d Cir.), *cert. denied,* 384 U.S. 942, 86 S.Ct. 1464, 16 L.Ed.2d 840 (1966). Consequently, it was unnecessary for the government to prove the employers' guilt as a predicate to Cody's. It was enough to show that the employers paid, lent or delivered the chauffeurs and that Cody accepted their services.

The trial court charged that the government was not required to prove that Cody requested or demanded the chauffeuring service, but merely that he received and knew that he was receiving a benefit of value. This charge fairly and properly tracked the language of § 186(b) which

makes it unlawful for a representative of a labor organization to receive anything of value from an employer.

■ Appellant attempts to distinguish his case from the typical § 186(b) charge by arguing that the chauffering services were given to Cody by the chauffeurs themselves, not by their employers. To hold that these services came from other than the employers, however, would allow § 186 to be circumvented almost at will. *See United States v. Pecora,* 484 F.2d 1289 (3d Cir. 1973). Here the salaries of Daglia, Ambrosio and Kay were paid by their respective employers. Instead of performing the jobs for which they were ostensibly hired, the three of them at different times spent their working hours, including overtime, providing free chauffeuring service to Cody. Although they may have served him willingly—after all, he was the head of the union of which they were members—the fact is that they did so while on the payroll of their respective employers. It is no different than if the employers had simply paid the salary of some person Cody had hired to be his chauffeur. That the three drivers carried the title "shop steward" or "working teamster foreman" does not in any way bear upon Cody's knowing receipt of something of value from an employer. *Cf. Haley v. Palatnik,* 509 F.2d 1038, 1042 (2d Cir.1975) (illegal payments to union representative made indirectly through use of trust funds); *United States v. Overton,* 470 F.2d 761, 765 (2d Cir.1972), *cert. denied,* 411 U.S. 909, 93 S.Ct. 1528, 36 L.Ed.2d 200 (1973) (payments made indirectly through non-employer corporate instrumentality). In short, the government proved the charges contained in Counts IV, V and VI.

## VI—PREJUDICIAL SPILLOVER

Appellant next contends that his conviction on all counts must be reversed because the admission into evidence of Marilyn Taggert's grand jury testimony violated his rights under the Sixth Amendment's Confrontation Clause. Cody's argument on this issue follows a three-step analysis: first, the trial court erred in admitting this testimony at trial; second, since Taggert's testimony was crucial to Cody's conviction on

Count II, that result must be reversed; and, third, Taggert's testimony as well as Cody's Count II conviction tainted the entire trial, requiring reversal of his conviction on all counts. We need not discuss whether the trial court erroneously admitted Taggert's grand jury testimony at trial because we have already determined that Cody's conviction under Count II—the count to which Taggert's testimony related—must be reversed. But we must consider whether its admission prejudiciously spilled over, tainting the evidence on the other counts.

■ Upon reviewing Taggert's testimony, we find that it could not have led a jury to convict on any count other than Count II. Defense counsel points to the evidence of Cody's "illicit" relationship with Taggert as a form of marital "cheating," yet we scarcely think that kind of proof will arouse a typical, sophisticated jury today. Appellant also contends that the prosecutor, while seeking a continuance following Taggert's disappearance, admitted that Taggert's testimony was essential to the entire indictment. That, too, strikes us as frivolous since counsel's view of the needs of his case before going to trial is hardly relevant in deciding whether a jury has been prejudiced by the proof it actually hears.

In addition, there is no reason to believe that Taggert's testimony or Cody's conviction on Count II prejudiced the jury with respect to the remaining counts. We fully recognize that when evidence is erroneously admitted, a reviewing court must be alert to the danger of prejudicial spillover. Specifically, a jury should not allow such evidence to "infect its consideration of facially unrelated aspects of the case . . . ." *Klein v. Harris,* 667 F.2d 274, 290 (2d Cir.1981). There was no substantial possibility of a prejudicial spillover effect in this case as Taggert's testimony fell almost entirely within the confines of the charges contained in Count II. Although she did make reference to the three chauffeurs, other evidence against Cody on those counts was so strong as to render such taint, if any, harmless. Hence, assuming that Taggert's grand jury testimony was inadmissible, it

provides no sufficient basis to reverse appellant's convictions on the other counts. *See United States v. Ivic,* 700 F.2d 51, 65 (2d Cir.1983).

## VII—COUNTS VII AND VIII

Finally, the indictment included Counts VII and VIII which charged Cody with tax evasion and filing a false return. Both of these counts arose from Cody's failure to report and pay taxes on the $100,000 kickback he received from John Strong following the "Pine Barrens" deal. Cody contests his conviction for these crimes on several grounds: the trial court erroneously failed to sever the first six counts of the indictment from the tax counts; the evidence was insufficient; the trial court improperly ordered defense counsel to produce a tape recording of an interview between a defense investigator and John Strong; and the government failed to disclose exculpatory evidence in the form of threats made by an FBI agent to Strong. We reject each of these contentions.

■ An appellate court will reverse a district court's denial of a Rule 14 motion to sever only upon the showing of a clear abuse of discretion. 1 C. Wright, *Federal Practice & Procedure,* § 227, at 854 (2d ed. 1982). *See* Fed.R.Crim.P. 14. In order to establish such an abuse the appellant must prove that he suffered prejudice so substantial as to deny him a fair trial. *United States v. Weisman,* 624 F.2d 1118, 1129–30 (2d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980); 1 C. Wright, *supra,* § 227, at 854–55. Denying appellant's severance motion was not an abuse of discretion. Joinder was entirely proper since Count I(c) of the indictment and the two tax counts were based on the same transaction—the kickback Cody received from Strong. Further, Cody failed to demonstrate prejudice. We acknowledge that some prejudicial effect will inevitably appear whenever two charges are joined, if only due to the fact that they arise out of the "same act or transaction." Apart from this, however, appellant has offered only conclusory allegations. The government presented sufficient, independent evidence on each count of the indictment, and the

fact that the jury voted to acquit Cody on two of the RICO predicates indicates that it considered each count separately.

■ Appellant's "insufficiency of evidence" argument is similarly without merit. At trial, Cody conceded his guilt on Counts VII and VIII, if the jury subsequently were to find—as it did—that he received a kickback from Strong. Thus, appellant essentially is asking us to consider again the very issues that were properly before the jury and ultimately resolved against him. Viewing the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), we find the proof—including Strong's prior statement that he had paid the $100,000 to Cody as a kickback—more than ample.

■ The third ground raised pertains to the disclosure by defense counsel of a taped interview with John Strong. When the government first made a motion to discover the tape, defendant objected and the court refused to grant discovery. After Strong testified, the court directed the defendant to make the tape available for inspection and, without objection, defense counsel complied. On this kind of issue, an objection not raised at trial is waived. *See United States v. Rose,* 525 F.2d 1026, 1027 (2d Cir.1975), *cert. denied,* 424 U.S. 956, 96 S.Ct. 1432, 47 L.Ed.2d 362 (1976). The reason for the rule is to enable the trial court to correct any error it may have made so that unnecessary future proceedings may be avoided. *United States v. Indiviglio,* 352 F.2d 276, 280–81 (2d Cir.1965) (en banc), *cert. denied,* 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966). Here defense counsel made a strategic decision to use the tape in his cross-examination of Strong, rather than forego its use and object to the court's ruling requiring him to produce. Accordingly, it is now too late to challenge the production order.

■ Finally, we address Cody's contention that the government's failure to disclose threats made against witness Strong warrants reversal. John Strong first began

to cooperate with the government on July 3, 1979 when he provided information of possible criminal activity involving Cody. Thereafter, Strong˙acted as an undercover operative at the direction of FBI agents. On February 18, 1980 Strong failed to record a telephone conversation he had with another criminal suspect, unrelated to the Cody investigation. As a consequence, FBI agents met with him at the New York Hilton three days later to stress the importance of his full cooperation. At the meeting Strong expressed his reluctance to record further conversations with Cody. One of the agents began to argue with Strong and apparently lost his temper saying that if Strong did not follow instructions he would throw Strong out the window or inform Cody that Strong was an informant.

Although prior to trial appellant had requested disclosure of exculpatory evidence, he was not apprised of these threats made to Strong until shortly after the trial concluded. Cody then moved for dismissal of the indictment or, alternatively, for a new trial under Federal Rule of Criminal Procedure 33. Applying the standard set by the Supreme Court in *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the district court denied appellant's motion. *Agurs* applies whenever a defendant makes a general request for exculpatory evidence,[1] and it provides that suppression of such evidence is significant

> if the omitted evidence creates a reasonable doubt that did not otherwise exist .... This means that the omission must be evaluated in the context of the entire

record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial.

427 U.S. at 112–13, 96 S.Ct. at 2402 (footnote omitted).

In the present case, it cannot be argued that the threats against Strong created "a reasonable doubt [as to Cody's guilt] that did not otherwise exist." The fact that Strong originally admitted, before the grand jury, to making the kickback and later recanted his testimony at Cody's trial raises doubt as to Strong's veracity. Yet the petit jury was well aware that Strong changed his story at trial, and it is unlikely that the jury's knowledge of the threats made against Strong would have weakened the government's case against Cody. Moreover, it is clear from Strong's trial testimony that he did not fear reprisal from the FBI agents. In fact, Strong's last-minute about face more readily suggests a substantial fear of Cody.

We do not condone the conduct of the FBI agents, and it would have been better for the government to disclose the threats since they did bear upon Strong's credibility. *Cf. Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (conviction reversed where nondisclosure affected a witness upon whom government's case almost entirely depended). Nonetheless, a prosecutor's failure to disclose evidence of only possible use does not automatically require a new trial. *Id.* at 154, 92 S.Ct. at 766; *United States v.*

---

1. Appellant's pre-trial discovery request inquired:

> Whether the government intends to call an informant or accomplice as a witness at trial. If so, please identify him or her and set forth the following:
> ....
> (d) any and all records, memoranda and correspondence between the witness and law enforcement authorities which might reasonably reflect on the witnesses' motives and relationship with the government.

Clearly, this request sought only documentary material—i.e. "records, memoranda and correspondence"—and the government responded by providing the defense with documents relating to Strong's cooperation. Appellant's only

other relevant request was phrased in vague, catch-all terms:

> Set forth all information and evidence, which would tend to exculpate the guilt of the defendant or mitigate the degree of the evidence or reduce the punishment which information and evidence is within the knowledge of the government or which by due diligence could be discovered by or made known to the government.

Taken either separately or together, these requests were not, as Cody now claims, specific enough to warrant our application of the more stringent *Brady* standard. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

*Keogh,* 391 F.2d 138, 148 (2d Cir.1968). As above articulated, the undisclosed evidence must have been material, *see Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), and the test for materiality in cases such as this is the *Agurs* standard. We conclude that whether or not the threat was before the jury, no reasonable doubt exists as to Cody's guilt. Thus, the government was not obligated to inform Cody of the threats made against Strong. As a consequence, the conviction on Counts VII and VIII must stand.

The judgment of the district court is reversed as to Count II of the indictment and affirmed on all other counts. The mandate of the court shall issue forthwith.