**UNITED STATES of America,**
**Appellee,**

v.

**Charles NOVAK, Defendant–Appellant.**

**Docket No. 05–0108–CR.**

United States Court of Appeals,
Second Circuit.

Argued, Nov. 18, 2005.

Decided: April 3, 2006.

---

Diarmuid White, White & White, New York, NY, for Defendant–Appellant.

Charles S. Kleinberg (Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, on the brief; Peter A. Norling, of counsel), Brooklyn, NY, for Appellee.

Before: SOTOMAYOR and KATZMANN, Circuit Judges, and EATON, Judge.[*]

EATON, Judge.

Defendant–Appellant Charles Novak ("Novak") appeals from a January 7, 2005 judgment of conviction entered in the United States District Court for the Eastern District of New York (Trager, J.) following a jury trial. Novak was found guilty of offenses related to his position as a union official, including the unlawful receipt of labor payments (29 U.S.C. § 186(b)(1) (2000)), making false statements under the Employee Retirement Income Security Act ("ERISA") (18 U.S.C. § 1027 (2000)), mail fraud (18 U.S.C. § 1341 (2000)), money laundering (18 U.S.C. § 1956(a) (2000)), racketeering (18 U.S.C. § 1962(c) (2000)), and conspiracy (18 U.S.C. §§ 371, 1956(h) and 1962(d) (2000)). He was sentenced principally to 108 months' imprisonment. Before us is Novak's appeal of the convictions for unlawful receipt of labor payments, mail fraud, making false ERISA statements, and, consequently, the conspiracy and Racketeering Influenced and Corrupt Organization Act ("RICO") charges. For the reasons set forth below, we affirm the convictions for unlawful receipt of labor payments and for the RICO conspiracy and substantive RICO violations, reverse the convictions for mail fraud and making false ERISA statements, and order supplemental briefing regarding Novak's remaining convictions.

## I.

Novak was the vice-president and business manager of Local One of the International Union of Elevator Constructors ("Local One" or "the Union"). Among other things, the Union's members operate the temporary elevators used to carry workers at construction sites in New York City. Part of Novak's job was to ensure that employers (usually construction contractors) at the sites complied with the Union's collective bargaining agreement. Novak received his salary directly from Local One.

At each job site, a "lead operator" supervised the other Union operators and decided what hours they were to work. In addition, at the close of each work week, the lead operator filled out the employees' time sheets, submitted them to a representative of the employer, and often distributed the weekly paychecks to the elevator operators. The lead operator's salary was paid by the contractor, not the Union. Nevertheless, Novak determined which Union members would act as lead operators.

The evidence at trial demonstrated that the submitted time sheets regularly included hours not actually worked by Union members. For a variety of reasons, however, the contractors agreed to the submis-

[*] The Honorable Richard K. Eaton, Judge of the United States Court of International Trade, sitting by designation.

sion of these "no-show" hours. For example, the discovery that a contractor was using non-union labor to operate the elevators might lead to the issuance of a check to a Local One operator for hours not actually worked. This payment would constitute a settlement for the contractor's violation of the collective bargaining agreement. On other occasions, advance agreements between the Union and a contractor would allow the use of non-union labor, or permit a contractor to employ Union elevator operators for fewer than the contractually agreed-upon hours. These agreements required the contractor to pay the Union operators as if they had worked those hours. In each case, a time sheet would be submitted for a Local One member claiming the hours, and the contractor would issue a check payable to that member. Novak's scheme took advantage of the contractors' payments by requiring the check's recipient to kick back a portion of the wages received for the no-show hours. These kickback payments to Novak were made without the contractors' knowledge.

In order to gain the cooperation of the Union members in his corrupt arrangement, Novak used his power to assign jobs. Local One maintained hiring lists, which contained the names of members who had been laid off or were between jobs. According to Union practice, a preference was to be accorded Union members who had been on the list for the longest period of time. In other words, those who had been out of work the longest were to be the first hired. Novak, however, with the assistance of his chosen lead operators, would often ignore the hiring lists and instead refer for work favored Union members whom he trusted to participate in his kickback plan without objection. By controlling the lead operators and the as-

signed Union workers, Novak assured his receipt of the kickback payments. This activity served as the foundation for Novak's indictment and subsequent convictions at trial.

## II.

■■■ "It [is] unlawful for an officer of a labor organization to receive or accept anything of value from someone who employs members of that labor organization." *United States v. Cody,* 722 F.2d 1052, 1057 (2d Cir.1983); 29 U.S.C. § 186(b)(1). Likewise, it is also a crime for an employer to "pay, lend, or deliver" anything of value to any representative of his or her employees. 29 U.S.C. § 186(a)(1). "[A]ny person who willfully violates this section shall, upon conviction thereof, be guilty of a felony." 29 U.S.C. § 186(d)(2). Novak argues that his conviction under § 186(b)(1) should be overturned because the contractors were not aware that he was receiving any of the money paid to the operators. According to Novak, this absence of knowledge by the contractors is fatal to the Government's charge. It is the Government's position, and that of the district court, that Novak's receipt of a portion of the contractors' payments as kickbacks was alone sufficient to justify a conviction under the statute. This being the case, we must determine whether Novak's conviction for violating § 186(b)(1) can be sustained if the contractors were not aware that a portion of their payments to their employees was being received by a union representative.

■■■ We first note that not all payments from an employer to a labor representative are prohibited by § 186. For instance, the statute provides an exception for certain payments made by an employer for deposit in an employee trust fund. *See* 29 U.S.C. § 186(c).[1] Indeed, the Supreme Court in

---

1. The statute provides that:

The provisions of [§ 186] shall not be appli-

*Arroyo v. United States,* 359 U.S. 419, 79 S.Ct. 864, 3 L.Ed.2d 915 (1959), reversed the conviction of a union official who deposited, for his own account, checks from an employer intended for deposit into such a fund. While acknowledging that the actions of the union representative were not devoid of criminality, the Court found that the conduct did not amount to a violation of § 186. Justice Stewart explained, "[t]he checks were drawn by the employers and delivered to the petitioner as payment to a union welfare fund. Their receipt by [petitioner], therefore, was not a violation of the federal statute, whether his intent to misappropriate existed at the time of receipt or was formed later." *Arroyo,* 359 U.S. at 424, 79 S.Ct. 864. Thus, *Arroyo* stands for the proposition that a lawful payment, lawfully received, even if later converted, does not support a conviction under § 186.

■ Where employer payments received by a union representative are not within a statutory exception, however, the result has been different. *See Cody,* 722 F.2d at 1052. In *Cody,* a jury convicted the defendant, the leader of a local union, of "receiving illegal benefits from employers in violation of 29 U.S.C. § 186(b)(1)." *Id.* at 1055. The basis for the conviction was defendant's participation in an arrangement whereby members of his union were paid by their employers to perform construction-related work, but instead spent their working hours acting as his personal chauffeurs. *Id.* at 1056. On appeal, defendant maintained that the government failed to establish that the employers intended to provide him with the services and, thus, that his conviction should be reversed. In upholding the conviction, this Court held "that nothing [in § 186] 'requires mutuality of guilt for the conviction of either the employer or the representative of employees.'" *Id.* at 1059 (quoting *Arroyo,* 359 U.S. at 423, 79 S.Ct. 864). To convict the defendant, "[i]t was enough to show that the employers paid, lent or delivered the chauffeurs and that [defendant] accepted their services." *Id.* Moreover, the Court rejected defendant's argument that his case was outside the scope of the statute because the services he received were from the employees as opposed to the employers, by stating that "[t]o hold that these services came from other than the employers ... would allow § 186 to be circumvented almost at will." *Id.* at 1060. Thus, under *Cody,* even though the payment does not violate the statute, its receipt by a labor representative can provide the basis for a conviction under § 186(b)(1). For this to be the case, however, we understand the rule of *Cody* to be that such conviction requires a showing that the transfer from the employer to the employee and the transfer from that employee to the union official are so closely related as to constitute a single transaction.

Novak's central argument is that *Cody* implicitly recognizes that the employers knew that their employees were providing personal chauffeur services. Nothing in *Cody,* however, compels this reading. Rather, this Court's observation that mutuality of guilt is not a prerequisite for the conviction of either an employer or a labor representative suggests otherwise. Moreover, that observation is consistent with the statute's structure. While sections 186(a) and (b) state that the making and receiving of certain payments are illegal

---

cable ... (5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents.

29 U.S.C. § 186(c).

without imposing an intent requirement, section 186(d) provides that, for a statutory violation to be found, an individual must have acted willfully. *See* 29 U.S.C. § 186(d). Thus, because the employers in *Cody* did not willfully transfer something of value to the union representative, they were not guilty of a crime. Nonetheless, Cody's willful receipt of the employees' services, paid for by their employers, warranted his conviction.

We find that the facts in *Cody* are significantly similar to those presented here. The employers in *Cody* engaged in the same conduct as the contractors in this case, i.e., they issued checks to employees as compensation. In both cases, the employees then provided a union representative with money or something of value resulting from that compensation. In each case, the employers were the source of the payment and the recipient was a union representative. The nature of the arrangements in both cases rendered the transfer of the money or other benefit from the contractor to the employee and then to the union official a single transaction. That is, in *Cody,* this Court found that there was no difference between the proven arrangement and one in which the employers "simply paid the salary of some person Cody had hired to be his chauffeur." *Cody,* 722 F.2d at 1060. Here, the kickbacks to Novak were inextricably linked to the employees' receipt of the paychecks from the contractors. Had the employees not agreed, for whatever reason, to participate in Novak's scheme, they would not have received paychecks from the contractors. Thus, the employees' receipt of paychecks from the contractors, and the employees' subsequent payments to Novak, were so closely related that a jury could conclude that the transfers in this case, like those in *Cody,* were actually between an employer and a union representative. Because we find the scenario presented here to be substantially the same as that found in *Cody,* we affirm Novak's conviction for receipt of unlawful labor payments under § 186(b)(1).

## III.

### A.

■ Novak next disputes his conviction for mail fraud under 18 U.S.C. § 1341. The foundation for the mail fraud charge lay in Novak's receipt, through the mail, of portions of the money that the contractors paid Local One members for the no-show hours. That is, the indictment charged Novak with using the mail to defraud and to obtain the property of the contractors. The statute prohibits using the mail in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341. This Court has interpreted this statutory language as requiring the government to show "proof of a 'scheme or artifice to defraud,'" which itself demands a showing that the defendant possessed a fraudulent intent. *United States v. Starr,* 816 F.2d 94, 98 (2d Cir.1987) (quoting 29 U.S.C. §§ 1341, 1343). While this language does not require the government to prove that the victims of the fraud were *actually* injured, the government "must, at a minimum, prove that defendants *contemplated* some actual harm or injury to their victims." *Id.* (emphasis in original). Indeed, "[o]nly a showing of intended harm will satisfy the element of fraudulent intent." *Id.* Thus, the question presented on this appeal is whether Novak, as a part of the kickback scheme, contemplated harming the contractors.

### B.

■ According to the Government, the element of fraudulent intent is satisfied by

the contractors' unwitting participation in Novak's plan. The Government's contention is that the contractors would never have issued checks for the no-show hours had they known that a portion of the money would be received by Novak, since doing so would have exposed them to criminal liability for unlawful payments to an employee representative under 29 U.S.C. § 186(a). Novak counters that no such harm to the contractors was ever intended. Rather, the money came from the Union members, thus suggesting that, if any harm was intended, it was to the property rights of the operators and not the contractors.

 While not explicitly set out, Novak's argument is that there was insufficient evidence to find that he intended to defraud the contractors. *See Starr,* 816 F.2d at 97. "We review a claim of insufficient evidence *de novo.*" *United States v. Lewter,* 402 F.3d 319, 321 (2d Cir.2005) (citations and internal quotation marks omitted). A defendant seeking a reversal of the jury's verdict on this ground, however, " 'faces a heavy burden, because we must view the evidence in the light most favorable to the government and ask only whether a rational jury could find beyond a reasonable doubt' that the appellant[ ] intended or contemplated some harm to the [contractors]." *United States v. Frank,* 156 F.3d 332, 335 (2d Cir.1998) (quoting *United States v. LaBarbara,* 129 F.3d 81, 84 (2d Cir.1997)).

While Novak's burden is indeed heavy, when faced with similar facts this Court has found the position urged by the Government to be untenable. In *Starr,* the defendants were owners of a bulk mail service. Customers of the service would calculate the postage for their mail and then issue a check to the defendants in that amount. Defendants' plan involved burying those pieces subject to higher postage rates under the lower-priced bulk mail, thus ensuring that the higher-priced mail would be sent at the bulk rate and allowing the defendants to keep for themselves the difference in postage. *See Starr,* 816 F.2d at 96. Given the relatively brief searches undertaken by Postal Officials, the defendants' scheme was, for a time, successful. Once their plan was uncovered, the government charged them with having violated the mail fraud statute by defrauding their customers. *Id.* at 95. In reversing the jury's guilty verdict, this Court found that, although the customers were unquestionably deceived, no evidence indicated that the defendants intended to defraud them. *Id.* at 99. In other words, while the customers' assumption that the money they paid to defendants would be directed toward a lawful purpose did "implicitly constitute[ ] a part of the bargain between the parties, that defeated expectation alone [did] not affect the nature or quality of the services [sic] that was the basis of the customers' bargain." *Id.* at 99–100. Therefore, this Court found that defendants possessed no intent to defraud their customers because "[t]he customers received exactly what they paid for." *Id.* at 98.

The Government argues that the holding in *Starr* has been modified by this Court's subsequent opinions in *United States v. Schwartz,* 924 F.2d 410 (2d Cir.1991), *United States v. Frank,* 156 F.3d 332 (2d Cir.1998), and *United States v. Walker,* 191 F.3d 326 (2d Cir.1999). For the Government, these opinions permit a conviction under the mail fraud statute if the victims would not have entered into the transaction had they known of the deception. We examine each cited case in turn.

In *United States v. Schwartz,* the defendants bought night vision goggles by falsely promising to abide by the manufacturer's explicit conditions that: (1) the

merchandise not leave the United States until the proper export certificates were obtained; (2) the identity of the end user be revealed; and (3) the merchandise not be sold in violation of the applicable arms export laws. *See Schwartz,* 924 F.2d at 414, 420–21. Despite their promises to fulfill these conditions, the defendants smuggled the merchandise into Argentina, provided the manufacturer with a false end user, and sold the merchandise in violation of the arms exports laws. *Id.* at 414. The defendants were then charged with wire fraud under 18 U.S.C. § 1343 [2] for "falsely representing, over interstate wires, that proper arms export licenses would be obtained before the goggles were shipped outside the United States." *United States v. Berg,* 710 F.Supp. 438, 439 (E.D.N.Y.1989).[3] Upon appeal of the conviction, this Court found that the receipt of full monetary compensation for the goods, and thus the avoidance of pecuniary harm, did not necessarily mean that the manufacturer, a government contractor, "received all it bargained for." *Schwartz,* 924 F.2d at 421. Indeed, the Court found that the illegal export and sale of the merchandise "deprived [the manufacturer] of the right to define the terms for the sale of its property," and resulted in a loss of business good will. *Id.* Given the central nature of the promises to the completion of the sale, the Court held that defendants' "misrepresentations went to an essential element of the bargain." *Id.* Thus, even though full payment was made for the merchandise, an intent to harm the manufacturer was shown by the defendants' acts and the conviction was affirmed. *Id.*

In *United States v. Frank,* the transaction involved a contract between a sewage transport company and various New York State municipalities for the removal of raw sewage and its subsequent disposal at sea. Newly enacted federal regulations required that the raw sewage be disposed of 106 miles from the shore, a significant increase from the previous distance of twelve miles. *See Frank,* 156 F.3d at 334–35. The contract called for the municipalities to be charged based on the operating costs incurred for moving the sewage the full distance. *Id.* at 335. The evidence indicated that the municipalities "paid a premium for that service." *Id.* Nevertheless, the transport company continually dumped the waste at distances far less than those contracted for, thereby resulting in a windfall equal to the difference between the contract price and the actual operating costs. *Id.* As in *Starr,* the defendant argued that the municipalities had received exactly what they bargained for, i.e., sewage removal. This Court found the argument to be without merit given the premium paid by the municipalities for disposal of the waste at the federally required distance. *Id.* That is, compliance with the regulations was an essential part of the bargain and thus, unlike in *Starr,* the municipalities did not get what they paid for. This Court, therefore, found the evidence sufficient to establish that the transport company possessed an intent to harm the municipalities. *Id.*

Finally, in *United States v. Walker,* the defendants, an immigration attorney and a language interpreter, challenged their convictions for mail fraud based on a scheme in which they filed fraudulent work authorization and asylum applications with the

---

**2.** The *Schwartz* Court noted that "[b]ecause the mail fraud and the wire fraud statutes use the same relevant language, we analyze them the same way." *Schwartz,* 924 F.2d at 416 (citation omitted).

**3.** When tried by the district court, the case appealed in *Schwartz* was referred to as *United States v. Berg.*

Immigration and Naturalization Service on behalf of their clients. *See Walker*, 191 F.3d at 331–32. As part of the plan, the clients signed blank forms, which the defendants subsequently completed with one of a series of stories previously found to garner a successful result in the application process. *Id.* Acknowledging that "[the] case [bore] a surface resemblance to *United States v. Starr*," this Court went on to distinguish it on its facts. *Id.* at 335. Unlike the defendants in *Starr*, the defendants in *Walker* "consistently misrepresented to their clients the nature and quality of the legal services they were providing." *Id.* This Court further noted that "[i]n *Starr*, the clients dealt with the defendants just as they would have dealt with an honest business. [In *Walker*], the clients were obliged to become parties to a dishonest scheme and were required to sign false statements themselves." *Id.* at 336. Indeed, "the applications embroiled several of [the clients] in legal difficulty, forcing them to sign cooperation agreements to avoid prosecution." *Id.* at 336 n. 1. As a result, this Court found that "there was sufficient proof that Walker intended to harm his clients by charging substantial fees for dishonest legal representation." *Id.* at 336. Thus, because the clients did not get what they bargained for, this Court found that the defendants intended to cause them harm. *Id.*

 We find unconvincing the Government's argument that the instant case falls within the ambit of *Schwartz, Frank,* and *Walker*. An intent to harm a party to a transaction cannot be found where the evidence merely indicates that the services contracted for were dishonestly completed.

That is the teaching in *Starr*. In *Schwartz, Frank,* and *Walker,* an intent to harm was found because the defendants' compliance with the law in carrying out their contractual obligations was a fundamental part of the bargain between the parties. Although the Government insists that the contractors would not have paid for the no-show hours had they been aware that Novak would receive a portion of the money, that hypothetical contention is inadequate to support a finding of fraudulent intent. To support a mail fraud claim, "the harm contemplated [in a scheme to defraud] must affect the very nature of the bargain itself. Such harm is apparent where there exists a 'discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver.'" *Starr*, 816 F.2d at 98 (quoting *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1182 (2d Cir.1970)). Here, as in *Starr*, the contractors received all they bargained for, and Novak's conduct did not affect an essential element of those bargains. Without more, the evidence is insufficient to show the requisite intent to harm. Because the Government failed to carry its burden of establishing that Novak intended to harm the contractors, we find the evidence insufficient to support the jury's verdict regarding the mail fraud charge, and thus reverse Novak's conviction on that count.

## IV.

### A.

Next, Novak asserts that his convictions under 18 U.S.C. § 1027[4] on three counts

---

4. Section 1027 provides that:
 Whoever, in any document required by title I of the Employee Retirement Income Security Act of 1974 (as amended from time to time) to be published, or kept as part of the records of any employee welfare benefit plan or employee pension benefit plan, or certified to the administrator of any such plan, makes any false statement or representation of fact, knowing it to be false, or

of making false ERISA statements should be overturned because the Eastern District of New York was not a proper venue for these charges. The statements that were the basis of these counts were reports made pursuant to Title I of ERISA relating to employee welfare and benefit plans. Specifically, it was alleged that Novak knowingly and intentionally reported in ERISA documents false information regarding the no-show hours attributed to several Union members. At the close of the Government's case, Novak made a motion pursuant to Rule 29 of the Federal Rules of Criminal Procedure [5] for a judgment of acquittal on these counts, asserting that venue in the Eastern District of New York was improper because the evidence demonstrated that the conduct on which the charges were based took place solely in the Southern District of New York.[6] The Government concedes that the Eastern District was not a proper venue for the charges, but argues that the venue

defect was apparent on the face of the indictment, and that Novak thus waived his right to contest venue by failing to object prior to trial. The district court agreed and denied Novak's motion.

### B.

"Both Rule 18 of the Federal Rules of Criminal Procedure and the Constitution require that a person be tried for an offense where that offense is committed."[7] *United States v. Cabrales,* 524 U.S. 1, 5, 118 S.Ct. 1772, 141 L.Ed.2d 1 (1998) (citations and internal quotation marks omitted); *see also United States v. Anderson,* 328 U.S. 699, 703, 66 S.Ct. 1213, 90 L.Ed. 1529 (1946) ("[T]he *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it."). Indeed, the Constitution protects a criminal defendant's right to proper venue in two places: Article III; and the Sixth Amendment.[8] An example

knowingly conceals, covers up, or fails to disclose any fact the disclosure of which is required by such title or is necessary to verify, explain, clarify or check for accuracy and completeness any report required by such title to be published or any information required by such title to be certified, shall be fined under this title, or imprisoned not more than five years, or both.

18 U.S.C. § 1027.

**5.** Under the Federal Rules of Criminal Procedure:

After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction. If the court denies a motion for a judgment of acquittal at the close of the government's evidence, the defendant may offer evidence without having reserved the right to do so.

Fed.R.Crim.P. 29(a).

**6.** Novak, having been acquitted of the other charges included in the Rule 29(a) motion,

the only offenses contained in the motion relevant to this appeal are those regarding the false ERISA statements.

**7.** Pursuant to Rule 18 of the Federal Rules of Criminal Procedure:

Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed. The court must set the place of trial within the district with due regard for the convenience of the defendant and the witnesses, and the prompt administration of justice.

Fed.R.Crim.P. 18.

**8.** Article III, § 2, cl. 3 of the Constitution provides that "[t]he Trial of all Crimes ... shall be held in the State where the said Crimes shall have been committed." Similarly, the Sixth Amendment requires that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed."

of the strength of that protection is manifested in the principle that, when an indictment charges a defendant with multiple counts, "venue must be proper with respect to each count." *United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir.1989).

■■■■■■ "[T]he constitutional underpinning and importance of proper venue dictate that waiver of objections to venue should not be readily inferred." *United States v. Price*, 447 F.2d 23, 27 (2d Cir. 1971). That being the case, this Court has found a waiver of the right to challenge venue in a criminal trial only under extraordinary circumstances. One such circumstance is "when the indictment or statements by the prosecutor clearly reveal [a venue] defect but the defendant fails to object." *Id.; see also United States v. Khan*, 821 F.2d 90, 93 (2d Cir. 1987) (finding waiver in light of a clear defect in venue apparent on the face of the indictment); *United States v. Levasseur*, 816 F.2d 37, 45 (2d Cir.1987) (agreeing with the district court that defendant had waived his right to contest venue at the close of evidence where "the indictment gave clear notice of venue defects."). Therefore, even though it is afforded significant Constitutional protection, a defendant's right to proper venue is a personal defense subject to waiver. *See United States v. Calderon*, 243 F.3d 587, 590 (2d Cir.2001).

■■■■■■ These cases establish a clear rule concerning the timeliness of a defendant's objection to venue in a criminal action. When the defect in venue is apparent on the face of the indictment, a defendant waives the right to contest the issue if he or she fails to object prior to trial. It follows that, when a venue defect is not clear on the face of the indictment, a defendant may raise the objection for the first time in a motion for acquittal at the close of the government's evidence.

With respect to the ERISA charges, Novak's indictment contained a narrative paragraph stating that the unlawful activity took place "within the federal judicial districts listed below and elsewhere." In addition, this portion of the indictment contained a grid, with a column headed "Federal Judicial District." For each charge, the grid listed the Southern District of New York as the Federal Judicial District. Thus, a fair reading of the Novak indictment, taking into account the information contained in the narrative as well as that contained in the grid, is that the filing of the false reports took place in "the Southern District of New York and elsewhere."

In support of its contention that this language demonstrated an obvious venue defect, the Government points to a Ninth Circuit case, *United States v. Johnson*, 297 F.3d 845 (9th Cir.2002). In *Johnson*, the indictment bore some similarity to that charging Novak. There, a narrative paragraph and a grid were used to charge the defendant with wire fraud under 18 U.S.C. § 1343. *Johnson*, 297 F.3d at 876. The narrative paragraph stated that the acts constituting the wire fraud took place "in the District of Arizona and elsewhere." *Id.* The grid then set out the origin and destination of each offending telephone call under columns marked "Call From," and "Call To." *Id.* As to eight of the counts, an examination of the information in these columns revealed that the acts constituting the crimes charged took place entirely outside the District of Arizona. *Id.* Under these facts, the Ninth Circuit held that the venue defect was apparent on the face of the indictment and noted that "[i]t is clear from [the] grid that certain counts did not involve any activity within the District of Arizona, as certain counts did not list Ari-

zona as either the site of origination or the site of destination." *Id.* at 861. Put another way, because the indictment contained all of the facts relating to the *situs* of the crimes charged, it was evident that there was no relation between the alleged acts and the District of Arizona.

There are important differences between the indictment in *Johnson* and the one at issue here. In *Johnson,* all of the information relating to the location of the alleged acts was contained in the "Call From" and "Call To" columns in the indictment. Here, there was no such clarity. That is, nothing in Novak's indictment precluded the conclusion that at least some of the charged criminal activity occurred in the Eastern District of New York. Indeed, because Novak's Union activities included conduct in both the Southern and Eastern Districts of New York,[9] he could have reasonably believed that the "and elsewhere" language meant that the Government intended to produce some evidence at trial linking the ERISA crimes to both the Southern and Eastern Districts. Thus, the venue defect was not evident on the face of the indictment.

As a result, we hold that Novak's venue objection made at the close of the Government's evidence was timely and, as the Government concedes, meritorious. We thus reverse, for improper venue, Novak's convictions for making false ERISA statements in violation of 18 U.S.C. § 1027.

## V.

Novak was also convicted of conspiracy to violate the RICO statute, as well as substantive RICO violations. The mail fraud conviction, and the convictions for receipt of unlawful labor payments, served as the predicate acts required to prove a

pattern of racketeering activity under 18 U.S.C. § 1962(c). *See* 18 U.S.C. § 1961(5) (defining a "pattern of racketeering activity" as requiring "at least two acts of racketeering activity."). Because we affirm Novak's multiple convictions for receiving unlawful labor payments, the RICO conspiracy and substantive RICO convictions are unaffected by the mail fraud reversal. We therefore affirm these convictions.

## VI.

The briefing before the Court as to how our reversals may affect Novak's convictions on other counts was necessarily limited. Therefore, we direct the parties to submit supplemental briefs addressing the question of whether our reversals have eliminated the underlying acts required for Novak's convictions for money laundering (Count 29), conspiracy to commit money laundering (Count 36), and "The No–Show Jobs Conspiracy" (Count 3).

## VII.

Novak was sentenced on December 1, 2004, prior to the Supreme Court's decision in *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). At sentencing, Novak objected under *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), to the compulsory application of the Sentencing Guidelines and thus preserved the error. *See United States v. Fagans,* 406 F.3d 138, 140 (2d Cir.2005). Although we agree with the parties that this case must ultimately be returned to the district court for resentencing, we await ordering remand until we have considered the parties' supplemental briefs.

---

**9.** Novak was responsible for territory that included the East Side of Manhattan, Staten Island, and part of Queens. Thus, part of his job was in the Eastern District of New York, and part of it was in the Southern District of New York.

## VIII.

We have considered Novak's remaining claims and find them to be without merit.

## IX.

For the foregoing reasons, we AFFIRM Novak's convictions for unlawful receipt of labor payments, RICO conspiracy, and substantive RICO violations. We REVERSE the convictions for mail fraud and for making false ERISA statements. Finally, the Office of the Clerk of Court will issue a scheduling order for the submission of the supplemental briefs referenced above.