297 F.3d 845
 UNITED STATES of America, Plaintiff-Appellee,
v.
Harry JOHNSON, aka Richard Steiner; Micah Rudisill, aka Mike Rodgers; Larry Ray Eames, aka Robert Eames, aka David Rodgers; Louise Maria Clark, aka Kelly Collins, aka Lois Collins, aka Kisha Smith, aka Louise Marie Clark; Gene Burce, aka John Loman, aka John Logan, aka Gene Bruce, aka Eugene Burce, Jr., aka John Foley; Michael Kevin Davis, aka H.P. Wills, aka H.P. Wells, aka H.H. Willis, aka H.G. Willis, Defendants-Appellants.
 No. 99-10411.
 No. 99-10412.
 No. 99-10413.
 No. 99-10414.
 No. 99-10423.
 No. 99-10425.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted October 18, 2001.
 Filed July 12, 2002.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Dennis C. Jones; Dana Carpenter, Carpenter & Hamilton, P.A.; George F. Klink; Patrick E. McGillicuddy; James Logan and Philip A. Seplow, Wisdom and Logan; Jon M. Sands; and John W. Rood, III, Phoenix, AZ, for the appellants.
 Scott Bales, Special Assistant U.S. Attorney, Phoenix, AZ, for the appellee.
 Appeal from the United States District Court for the District of Arizona; Roslyn O. Silver, District Judge, Presiding. D.C. No. CR-97-00237-ROS.
 Before: GOODWIN, HUG, and THOMAS, Circuit Judges.
 HUG, Circuit Judge.
 
 
 1
 Following a 17-week trial, Harry Johnson, Gene Burce, Michael Davis, Louise Clark, Micah Rudisill, and Larry Eames ("Defendants") were found guilty of conspiracy to commit fraud, conspiracy to commit money laundering, mail fraud, and wire fraud for their involvement in a fraudulent telemarketing scheme. Rudisill and Eames were also found guilty of money laundering. Each defendant appealed his or her conviction and sentence on multiple grounds, and the six appeals were consolidated into a single matter for consideration by this court. For the reasons set forth below, we affirm Defendants' convictions and sentences.
 
 Factual and Procedural Background
 
 2
 Facts introduced at trial revealed the following. In 1995 a telemarketing business known as American Eagle Advertising ("AEA") began operating in Chamblee, Georgia — a suburb of Atlanta. The company, managed by Larry Eames and Micah Rudisill ("Managers"), initially sold magnetic business cards, pens, coffee mugs, and other advertising speciality items strictly to solicited businesses. At some point, however, Eames and Rudisill determined that they could increase profits by expanding their operation to include sales to solicited individuals. To that end, Eames and Rudisill began developing the telemarketing scheme that forms the factual backdrop of this case. For the sake of clarity, the development of this scheme might be broken into two phases: the organizational phase and the operational phase.
 
 
 3
 The organizational phase began in December of 1995, when Rudisill approached Rahim Rashada, a former telemarketing co-worker (and cooperating co-conspirator at trial). At the time he was contacted by Rudisill, Rashada was employed as the sales manager at an Atlanta company known as Home Benefits Organization ("HBO"). Rashada's duties at HBO included the hiring, training, and supervision of a team of salespeople, a team that included Gene Burce, Michael Davis, Louise Clark, and Harry Johnson. Rudisill told Rashada that he and Eames were interested in developing a scheme for selling to solicited individuals, and offered to make Rashada a partner in the plan if Rashada would bring his sales team and leads over to AEA. Rashada agreed, and by January of 1996, Burce, Davis, Clark, and Johnson ("Reloaders")[1] were all working as telemarketers at AEA.
 
 
 4
 With leads and a sales team in place, AEA moved on to the operational phase of its individual-solicitation scheme. The idea behind the scheme was fairly straightforward. Individuals were called and run through a "qualifying pitch," during which the AEA telemarketer would determine if the individual was a "mooch" — that is, someone who would be susceptible to the scheme. In qualifying individuals, AEA focused primarily on relatively isolated, elderly individuals who had demonstrated a past interest in telemarketing promotions. Once a person was qualified, AEA would call them back and tell them that they had won a prize, the collection of which was contingent upon the purchase of AEA ad specialty products. As the ad specialty products were worth a small fraction of the sale price, and the large prizes did not exist, AEA realized significant profits on every transaction it made with these qualifying individuals.
 
 
 5
 The scheme did not end, however, with a single sale to an individual. Once an individual made a purchase, they were deemed excellent targets for additional sales. Thus, AEA telemarketers would "reload" these people — that is, they would call them to encourage additional purchases, always with the promise of larger and more certain rewards that, again, did not exist. In order to facilitate the "reload" sale, AEA would send out nominal prizes to purchasers — typically, in the form of gold coins — to foster a belief that large prizes were potentially available. In addition, AEA told these buyers that AEA could donate items to charity on the customer's behalf, thereby creating an additional incentive to buy. Because few gifts were ever donated to charities, charitable purchases generally succeeded only in raising AEA's profits.
 
 
 6
 Just as the scheme to sell to individuals was fairly straight-forward, the plan implemented to cover-up AEA's activities was relatively simple. In December of 1995, at about the same time that Rudisill was recruiting Rashada, Eames opened up a new AEA office in Phoenix, Arizona. Although the Phoenix office did engage in AEA's traditional operation of selling ad specialty products to solicited businesses, its main purpose was to provide cover for the individual solicitations being conducted out of Atlanta. As described below, this cover was achieved by concealing the existence of the Atlanta office and making sales to individuals look like sales to businesses.
 
 
 7
 Prior to each individual solicitation, AEA's Atlanta telemarketers dialed *671 to prevent victims from tracing any calls back to Atlanta. If in the course of the sales pitch, a customer asked where the company was located, the telemarketer would say that the company was located in Phoenix and that he was calling from that location. AEA's Atlanta address and phone number were never given to customers, and, upon making a sale, the telemarketers always instructed the individual to send payment to the AEA office in Phoenix. By employing these tricks, AEA ensured that individual customers believed that they were dealing with the Phoenix office of AEA. This was important, as it guaranteed that any complaints or suspicions would be directed at that office, which was specifically designed to withstand inspection.
 
 
 8
 The Phoenix office was able to withstand external scrutiny because AEA made all individual sales out of Atlanta look like sales to businesses. This was accomplished primarily through the verification process. Upon making a sale, Reloaders would coach their victims on what to say when another AEA employee called to verify the purchase of the ad specialty items. In particular, individuals were told to describe themselves as a business customer. Once instructed on what to say, and after payment had been received, an AEA employee in the Phoenix office, Teresa Eames (Eames' ex-wife), would call and tape-record a "clean" tape of the individual confirming their purchase as a business. If the customer failed to say the right things, an AEA telemarketer would call for another rehearsal, and Ms. Eames would reverify the sale.
 
 
 9
 In addition to the verification process, AEA covered up its Atlanta sales through its "bonus credit release" form. With each shipment of ad specialty goods, an individual received a "bonus credit release" form, which the customer was instructed to sign and return to receive gold coins and other prizes. The forms lent an aura of legitimacy to AEA — customers did receive items after submitting forms, albeit items of little value in relation to their payments to AEA — while allowing AEA to obtain signed statements from the customer confirming that they were a business. Essentially, together with the verification process, the "bonus credit release" forms washed over the individual solicitation operation of the Atlanta office by making it appear as though AEA sold only to businesses, and sold only through Phoenix.
 
 
 10
 While the Phoenix office was the heart of AEA's cover-up, additional methods were employed to avoid detection. Messages from Phoenix about Atlanta customers were destroyed, and all leads, pitch-books, and sales records used by Reloaders were collected by Rudisill at the end of the day and removed from the Atlanta office. In addition, Reloaders (1) falsified their sales orders by including the fictitious business names they had instructed customers to adopt, (2) understated the sales amounts to hide the volume of sales to individuals (generally by dropping the last zero), and (3) used aliases whenever contacting customers.
 
 
 11
 Though the idea and cover-up were fairly simple, AEA's scheme was incredibly effective. Targeting the elderly, AEA took in more than 10 million dollars through roughly 1300 sales to over 300 individuals. This amounted to about $8.5 million in profit after AEA's direct expenses for the scheme, which included $1.5 million in "hard gifts" for its reloaded customers, and $117,000 on the ad specialty items sold to its customers.
 
 
 12
 In addition to its financial achievements, AEA successfully concealed its scheme for close to 18 months. Perhaps this is unsurprising, given that by all outward appearances AEA looked to be a legitimate telemarketing operation. AEA's offices regularly communicated about sales, and Reloaders held daily sales meetings, periodic training sessions, and worked together on difficult customers.
 
 
 13
 Yet, for all its success, the AEA scheme proved imperfect. The dodge ended with convictions for Defendants on multiple counts ranging from wire fraud to conspiracy, which they now appeal on various grounds. The district court had jurisdiction pursuant to 18 U.S.C. § 3231, and we have jurisdiction under 28 U.S.C. § 1291. We affirm.
 
 Discussion
 
 14
 I. Challenges Raised Collectively by Defendants
 
 
 A. Severance
 
 
 15
 Defendants' first challenge deals with severance. During the proceedings below, Defendants filed multiple motions to sever. See FED. R. CRIM. P. 14. Specifically, Eames and Rudisill moved to be tried separately from one another; Reloaders moved to be severed from Managers; and Managers moved to be tried apart from Reloaders. The district court denied each motion, and Defendants challenge these decisions on appeal.
 
 
 16
 Criminal defendants bear a heavy burden when attempting to obtain reversal of a district court's denial of a motion to sever. See United States v. Hanley, 190 F.3d 1017, 1027 (9th Cir.1999). Such decisions will be reversed only when "the joint trial was so manifestly prejudicial as to require the trial judge to exercise his discretion [on the motion to sever] in just one way, by ordering a separate trial." Id. at 1027 (citation and internal quotation marks omitted). In arguing that a joint trial was manifestly prejudicial, it is insufficient to show that separate trials might have afforded an increased chance of acquittal. See United States v. Ramirez, 710 F.2d 535, 546 (9th Cir.1983). Rather, a defendant must show that the failure to sever prevented him from obtaining a fair trial. See id. at 546. Additionally, if the district court attempted to cure any risk of prejudice with proper limiting instructions, a defendant must also show that the curative instructions were inadequate. See Hanley, 190 F.3d at 1027.
 
 
 1. Severance of Eames and Rudisill
 
 
 17
 Eames and Rudisill claim that joinder with one another was manifestly prejudicial because it allowed the jury to hear evidence against each man that would not have been admitted had they been tried alone. See Zafiro v. United States, 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993) (noting that severance might be appropriate "when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant"). In support of his claim, Eames points to the testimony of Rahim Rashada. According to Eames, Rashada's testimony on three points — (1) the Atlanta operation, (2) the theft of leads for Rudisill at an earlier job, and (3) Rudisill's statement to Rashada that Rudisill, Rashada, and Eames would be partners in AEA — would not have been admitted in a separate trial because Eames did not have any dealings with Rashada. Rudisill, on the other hand, cites to the testimony of Ms. Eames. According to Rudisill, testimony about the following private conversations between Eames and Ms. Eames would not have been admitted against him had he received a separate trial: (1) a conversation in which Eames told Ms. Eames not to worry about the indictment, because "I'm the only one who knows all of the pieces of the puzzle" and "By the time this goes to trial, all of the witnesses will be dead;" (2) a conversation in which Eames told Ms. Eames that he could not shut down the Atlanta office, despite complaints, because he would be unable to pay his personal bills if that office was shut down; (3) a conversation in which Eames referred to an undercover IRS agent as a possible "fed"; and (4) a conversation in which Eames referred to certain funds derived from Atlanta customers as "blood money."
 
 
 18
 We find Eames' and Rudisill's claim unpersuasive. The "spillover" evidence on which each relies was not manifestly prejudicial because each piece of evidence either (1) would have been admitted in separate trials, (2) was inconsequential in the grand scheme of things, or (3) was rendered nonprejudicial through limiting instructions that Eames and Rudisill have not shown to be deficient. See Hanley, 190 F.3d at 1027.
 
 
 19
 The conspiracy charges against Eames, as well as the substantive charges stemming from the conspiracy, involved conduct that took place in the Atlanta office of AEA, as that office was the site of the fraudulent phone calls, the procurement of illicit funds, and the reinvestment of illicit funds for additional criminal activity. Thus, even though Rashada worked primarily with Rudisill in Atlanta, virtually all of Rashada's testimony was relevant to the case against Eames and would have been admissible in a separate trial. The single piece of testimony that Eames points to that might not have been admissible was Rashada's testimony about the theft of leads at an earlier job. However, this statement was cured by a limiting instruction from the district court, and Eames does not argue that the instruction was insufficient.[2]
 
 
 20
 As to Rudisill, the district court provided limiting instructions for the first three conversations that he cites as objectionable, and he has not shown on appeal that these instructions were insufficient to cure any prejudice.[3] The district court did not provide a specific limiting instruction for the testimony involving the conversation about "blood money." However, this vague testimony constituted but one minor piece of evidence in the course of a 17-week trial in which the government presented significant proof of Rudisill's guilt, including testimonial and documentary evidence showing that Rudisill helped originate the idea to sell to individuals, trained the sales staff in Atlanta how to reload customers, drafted the fraudulent front pitch, reviewed all the sales orders coming out of Atlanta, and transferred funds to and from the Phoenix office to fund the operation in Atlanta. Given these circumstances, admission of the "blood money" testimony did not render Rudisill's trial unfair.[4]
 
 
 21
 Because the evidence presented at their joint trial either would have been admissible in separate trials, was sufficiently dealt with through limiting instructions, or was insignificant in the context of the overall case, we cannot say that Eames and Rudisill suffered manifest prejudice from being joined together. Thus, we decline to upset the district court's sound rulings on their motions to sever from one another.
 
 
 2. Severance of the Managers and Reloaders
 
 
 22
 Both Managers and Reloaders argue that they were so prejudiced from trial with each other that the district court should have granted severance. Defendants collectively offer three arguments in support of this claim. First, they argue that certain evidence was admitted against all six of them that would have been admissible against only one of the two groups had the groups been tried separately. Second, they claim that Managers and Reloaders, as groups, adopted mutually antagonistic defenses. Finally, Defendants argue that the size of the case, the number of parties, and the number of instructions made the trial too confusing to allow the jury to compartmentalize the evidence, claims, and instructions that applied to each of the defendants.[5]
 
 
 23
 (i) Admissibility of Evidence
 
 
 24
 Each group cites to a piece of evidence that they claim would have been admissible against only the other had they been tried separately, and which was prejudicial to the "inadmissible" group. Managers point to Rashada's testimony that, prior to working at AEA, he and Reloaders were employed by a telemarketing company called HBO, which apparently had also engaged in fraud. Reloaders, on the other hand, point to Rashada's testimony regarding his theft and sale of leads to Rudisill prior to his employment at AEA.
 
 
 25
 For each of the objectionable pieces of evidence cited above, the district court took steps to minimize any potential "spillover" effect. As to Rashada's testimony about HBO, before trial the district court made it clear that Rashada was not to suggest that the operation at HBO was fraudulent. The record reflects that this instruction was heeded, as at no point did Rashada mention that he and Reloaders engaged in fraud while working at HBO.[6] Regarding Rashada's comments about stealing leads for Rudisill, the district court granted a motion to strike when this testimony was introduced and instructed the jury to ignore the answer. Shortly thereafter, the district court also directed the jury "not to assume that any of the defendants knew that the leads ... were stolen." In light of these steps by the district court, which Defendants do not claim were insufficient to cure any prejudice, we conclude that any "spillover" of evidence did not prejudice Defendants enough to warrant a severance.
 
 
 26
 (ii) Mutually Antagonistic Defenses
 
 
 27
 Defendants argue that joinder was prejudicial because each group's defense essentially amounted to a second prosecution of the other group — a so-called mutually antagonistic defense claim. In advancing their mutually antagonistic defense claim, Defendants rely on the following simple assertion. Managers' and Reloaders' defenses were mutually antagonistic because Managers defended their case by arguing that any criminal activity at AEA was due to the unknown activities of AEA employees engaged in fraudulent "freelance telemarketing," while Reloaders defended their position by arguing that any scheme at AEA must have been perpetrated at the top levels, and that they were innocent victims of deliberate misinformation and deception.
 
 
 28
 It is difficult to obtain severance on the basis of a mutually antagonistic defense claim. We have previously stated that "[a]ntagonism between defenses or the desire of one defendant to exculpate himself by inculpating a codefendant ... is insufficient to require severance." United States v. Throckmorton, 87 F.3d 1069, 1072 (9th Cir.1996). To demonstrate that competing defenses amounted to manifest prejudice in a joint trial, a defendant must show "the core of the co-defendant's defense is so irreconcilable with the core of his own defense that the acceptance of the co-defendant's theory by the jury precludes acquittal of the defendant." Hanley, 190 F.3d at 1028 (internal quotation marks omitted). We hold that Defendants cannot meet this burden.
 
 
 29
 The principle flaw in Defendants' argument is that upon close inspection, it is obvious that their defenses at trial were not really in conflict. It is true that Managers attempted to deflect blame by impugning the character of less senior AEA employees. In particular, Managers suggested to the jury, during opening argument and cross-examination, that nonmanagement employees, possibly in Phoenix or Atlanta, probably engaged in fraudulent telemarketing, and that former AEA telemarketers had stolen leads from the company and held themselves out as still working for the company. However, Managers provided no evidence to suggest that Reloaders were in fact these employees. Indeed, our combing of the record indicates that Managers never even suggested that Reloaders were the guilty parties. Considering that AEA had numerous telemarketers working in both Atlanta and Phoenix, it is clear that nothing in Managers' defense was in conflict with the core of Reloaders' defense. The jury could reasonably have concluded that Managers were hoodwinked by their employees without finding that Reloaders were the culprits.[7]
 
 
 30
 Similarly, nothing in Reloaders' defense conflicted with the core defense of Managers. Reloaders provided virtually no evidence to support their claim that they were deceived by some cabal at the upper echelons of AEA, and certainly never pointed the finger directly at Eames or Rudisill. In light of the fact that other management personnel were implicated in the scheme (like Ms. Eames, Rashada, and AEA's corporate secretary/treasurer, Rebecca Setzer), the jury could have accepted Reloaders' theory of a conspiracy at the top without necessarily concluding that Eames and Rudisill were to blame.
 
 
 31
 Because the jury could have easily accepted either group's defense without convicting the other group, the defenses in this case were not mutually antagonistic. As such, severance was not required on the basis of Defendants' mutually antagonistic defense claim.
 
 
 32
 (iii) Compartmentalization of Evidence
 
 
 33
 Defendants' final argument in favor of severance is that the sheer size of the trial was manifestly prejudicial because it left the jury unable to compartmentalize the evidence — that is, to determine which evidence applied to which defendant, and thereby return a reliable verdict of guilt or innocence. In support of this argument, Defendants point to the length of the trial (17 weeks); the multiplicity of parties and counts; the large number of limiting instructions that were used to designate which pieces of evidence were applicable to which defendants; and, perhaps most importantly, the fact that the jury brought back guilty verdicts on all counts against all six of them. See United States v. Unruh, 855 F.2d 1363, 1374 (9th Cir.1987) (stating that "[t]he best evidence of [a] jury's ability to compartmentalize the evidence is its failure to convict all defendants on all counts").
 
 
 34
 It is beyond dispute that the proceedings in this case were lengthy and complex. However, any prejudice that might have stemmed from the complexity of the trial was avoided by the district court's skillful handling of the case. Throughout the trial, the district court regularly conducted hearings and bench conferences to efficiently regulate the flow of evidence to the jury. Whenever requested and appropriate, limiting instructions were provided to focus the jury's attention on the defendant(s) to which a particular piece of evidence applied. At the end of the trial, the court lifted the vast majority of these instructions (principally those relating to trial exhibits), and clearly identified for the jury those instructions that remained.[8] In addition, during the jury charge, the district court provided clear guidance on the government's burden of proof, and stressed to the jury that it was to "give separate consideration as to each defendant" and that it "must determine what the evidence in the case shows with respect to each defendant, leaving out of consideration any evidence admitted solely against some other defendants." Finally, the court reminded the jury that "[t]he fact that you may find one of the defendants guilty or not guilty should not control your verdict as to any other defendants." Under these circumstances, that the jury returned a guilty verdict as to each defendant does not suggest to us a failure to compartmentalize. Rather, it suggests that the jury found sufficient evidence to convict each defendant.[9]
 
 
 35
 On the basis of the district court's instructions, and basic conduct of the trial, we reject Defendants' claim that the complexity arising out of their joint trial was manifestly prejudicial. Thus, we affirm the district court's denial of their motions to sever.
 
 
 B. Venue
 
 
 36
 Defendants' second challenge raises the issue of venue. Defendants argued below that venue was improper as to counts 21-33 of the Superseding Indictment, the wire fraud counts, because the government never showed that the crimes alleged in these counts took place in the District of Arizona. The district court agreed that venue was improper as to counts 22, 25, 26, 28, 30, 31, and 32. However, the court rejected Defendants' motion to dismiss on the ground that Defendants waived their objection to venue by not raising it in a timely manner. Defendants claim the district court's decision was erroneous. We review this issue de novo. See United States v. Ruelas-Arreguin, 219 F.3d 1056, 1059 (9th Cir.2000).
 
 
 37
 The Sixth Amendment guarantees criminal defendants the right to be tried in the state and district in which the crime was committed. See U.S. CONST. amend. VI; see also FED. R. CRIM. P. 18 (stating that "[e]xcept as otherwise permitted by statutes or by these rules, the prosecution shall be had in a district in which the offense was committed"). The right to proper venue, however, may be waived. See United States v. Evans, 62 F.3d 1233, 1236 (9th Cir.1995). Specifically, "i[f] a defect in venue is clear on the face of the indictment, a defendant's objection must be raised before the government has completed its case," or the objection to venue will be waived. See Ruelas-Arreguin, 219 F.3d at 1060.
 
 
 38
 It is undisputed that Defendants did not raise the objection to venue until after the government completed its case. Thus, the central question here is whether or not the venue defect was clear on the face of the indictment. The answer to this question depends on whether the indictment contained allegations of fact that, if true, would sustain venue in the District of Arizona. If the indictment contained such allegations, then the defect was not clear from the face of the indictment, and Defendants should have been allowed to object to venue at the close of the government's case (an objection the lower court would have sustained as to at least seven counts). If, on the other hand, the indictment did not contain such allegations, then the defect was clear, and Defendants waived their objection to venue by failing to raise the challenge before the close of the government's case.
 
 
 39
 Reviewing the indictment in its entirety, we conclude that it did not, as to the counts at issue, contain allegations of fact that would sustain venue in the District of Arizona. The indictment presented counts 21-33 in a grid-like format. See Appendix A. For each wire communication constituting a count, a site of origination and a site of destination was listed. It is clear from this grid that certain counts did not involve any activity within the District of Arizona, as certain counts did not list Arizona as either the site of origination or the site of destination. Therefore, it was apparent from the indictment that venue was not proper in Arizona as to certain counts, and Defendants waived their objection to venue by failing to raise the challenge before the close of the government's case.
 
 
 40
 The fact that the indictment stated that the various acts in counts 21-33 took place "in the District of Arizona and elsewhere" does not change our opinion. Defendants claim that this language conveyed that each of the alleged crimes took place in both the District of Arizona and some other place — in the sense that wire fraud occurs in both the state where the communication originates and the state where it is received. As such, Defendants argue, the defects in venue were not clear from the indictment. However, this interpretation of "Arizona and elsewhere" is plausible only when one ignores the aforementioned grid. When the language is read in conjunction with the grid, which indicates that certain counts were not originated or received in Arizona, it is most reasonably interpreted as meaning that some of the alleged acts took place in Arizona, while others took place entirely elsewhere. As such, this language does not alter our view that the venue issue was apparent from the indictment, and that the district court's decision to deny Defendants' motion to dismiss certain counts for lack of venue should be affirmed.
 
 
 C. Exclusion of Expert Testimony
 
 
 41
 Defendants' third challenge involves the district court's exclusion of an expert witness. At trial, Defendants attempted to call an expert on the United States Sentencing Guidelines to testify on the sentences that each of the cooperating co-conspirators might have received had they not entered plea contracts and agreed to testify for the government. According to Defendants, this expert testimony was necessary to show the jury just how large a benefit the cooperating witnesses were receiving for their testimony — a showing that might impeach the credibility of these witnesses in the eyes of the jury. The district court refused to allow the expert testimony, finding it irrelevant under Rule 401 of the Federal Rules of Evidence, and Defendants now challenge the district court's decision on appeal. A district court's decision to admit expert opinion testimony is reviewed for abuse of discretion. See United States v. Alatorre, 222 F.3d 1098, 1100 (9th Cir.2000).
 
 
 42
 We conclude that Defendants' challenge is without merit. Even if we were to accept their argument that the district court abused its discretion in not allowing the expert to testify, Defendants have not shown that they suffered prejudice as a result of this error. See Brown v. Sierra Nevada Mem'l Miners Hosp., 849 F.2d 1186, 1190 (9th Cir.1988) (holding that "to reverse on the basis of an evidentiary error, we must say that more probably than not, the error tainted the judgment") (internal quotation marks omitted). Each of the cooperating witnesses stated on direct and/or cross-examination that he or she was testifying in hopes of receiving a significant reduction in possible prison time, and that the plea agreement offered significant benefits. Moreover, the district court instructed the jury to consider the testimony of the cooperating witnesses with great caution. Under these circumstances, expert testimony on the benefits potentially conferred on the cooperating witnesses would not have impeached the credibility of these witnesses beyond what was already accomplished. Therefore, it is not probable that exclusion of the expert testimony affected the verdict, and any potential error in excluding the testimony cannot serve as a basis for reversal.
 
 
 D. Admission of Hearsay Evidence
 
 
 43
 Defendants next argue that the district court erred by admitting certain records into evidence. At trial, Defendants objected, on the basis of the hearsay rule, to the admission of various sales orders, verification tapes, checks, and bank records — all offered to show either specific fraudulent transactions or the scope of AEA's illegal operation.[10] The district court agreed that the records generally amounted to hearsay, but nonetheless admitted the records, holding that they fell under the business records exception to the hearsay rule. See FED. R. EVID. 803(6).[11] Defendants challenge this decision on appeal. A district court's decision to admit evidence under an exception to the hearsay rule is reviewed for an abuse of discretion. See United States v. Ortega, 203 F.3d 675, 682 (9th Cir.2000).
 
 
 1. Sales Orders and Verification Tapes
 
 
 44
 In challenging the district court's decision to admit the sales orders and tapes under the business records exception, Defendants focus solely on the source of the information contained in the records. According to Defendants, the information in the tapes and sales orders came from AEA's customers, not itrs employees. Relying on this assertion, and the fact that the business records exception does not cover information derived from customers (unless such statements have been verified), Defendants argue that the district court erred in allowing the tapes and orders in under Rule 803(6), and that their convictions should be overturned as a result of this error. See United States v. Arteaga, 117 F.3d 388, 395 (9th Cir.1997); see also FED. R. EVID. 803(6), Advisory Committee Note to Paragraph (6)(stating that if "the supplier of the information [in the business record] does not act in the regular course [of business], an essential link is broken; the assurance of accuracy [that justifies the exception] does not extend to the information," and the exception should not apply).
 
 
 45
 We cannot accept Defendants' position. Contrary to Defendants' claim, AEA employees, acting in the ordinary course of business, were the source of much of the information in the tapes and sales orders. In completing the sales orders, Reloaders supplied first-hand information on the quantity sold, the price obtained, the date of the transaction, the false business name concocted for the customer, the number called, and the name and address given by the person on the other end of the line. This information provided much of the content for the verification calls. In addition, Rudisill and Ms. Eames recorded on the sales orders, without input from customers, the amount of the token gift to be sent to customers, shipping information, and notes indicating that a given sale was verified.
 
 
 46
 To the extent customers were the source of information in the tapes and sales orders, as opposed to AEA employees under a duty to record, the information provided was either verified by an employee in Phoenix, or, as in the case of customer complaints, was expressly not offered for the truth of the matter asserted, and thus was not hearsay in need of an exception. See Arteaga, 117 F.3d at 395-96. In light of the foregoing, we conclude that the district court did not abuse its discretion in admitting the tapes and sales orders under the business records exception.
 
 
 2. Checks and Bank Records
 
 
 47
 As with the sales orders and verification tapes, Defendants challenge the district court's decision to admit certain checks and AEA bank records[12] on the ground that AEA customers provided the information in these records. This argument is meritless as to the bank records. The information in the bank records arose out of the banks' first-hand observation of transactions related to the AEA accounts they maintained. Essentially, each deposit slip represented the bank's independent recording of an amount of money received for a particular account. Thus, it is clear that the banks were the source of the information in the bank records.
 
 
 48
 Defendants' argument is slightly more compelling as to the checks, given that the name and amount on each check were provided by an AEA customer, and there is no indication that the banks took steps to verify the truth of this information. However, we need not pass on whether the checks were properly admitted under the business records exception, as we conclude that any error that might have resulted from their admission was harmless beyond a reasonable doubt. See United States v. Olano, 62 F.3d 1180, 1189 (9th Cir.1995) (noting that we review for harmless error a district court's improper admission of hearsay).
 
 
 49
 The checks to which Defendants object were offered by the government to demonstrate the size of the fraud perpetrated by AEA, which in turn tended to demonstrate knowledge of the fraud on the part of AEA's employees (it would be difficult to accept a claim of ignorance when the organization was conducting illicit activities on such a grand scale). The checks were no doubt useful in conveying to the jury the magnitude of AEA's scheme. Each one, with its accompanying deposit slip, represented a deposit of funds generated by the Atlanta office of AEA, an office that was shown to have made money only by fraud.[13] The number of checks offered, and the dollar amounts represented therein, demonstrated that AEA's fraud was extensive both in terms of the total number of people affected and the total dollar amount lost. However, even without the checks, there was sufficient evidence in the record to lead the jury to conclude that AEA conducted its illegal operation on a grand scale.
 
 
 50
 The evidence at trial showed that AEA's Atlanta office made fraudulent telemarketing sales for roughly 18 months. During that time, the office pitched about 1000 consumers each week, which produced enough business during the life of AEA to justify at least 1300 customer verification calls on the part of Ms. Eames. Each call was made only after the relevant customer's check was received, and it was shown that the Phoenix office received checks stemming from Atlanta sales on a daily basis. Testimonial evidence showed that the reloaders in Atlanta did as much as $250,000 in sales in one week, with individual reloaders occasionally making more than $100,000 in sales in a one-week period. Finally, the small percentage of victims who appeared at trial collectively testified to sending well over one million dollars to AEA. In light of this evidence, the jury could easily conclude that AEA was a large, sophisticated scheme. As such, the checks, to the extent they tended to corroborate this depiction of AEA, were merely cumulative, and their admission was harmless.[14]
 
 
 E. Anti-Gratuity Statute Violation
 
 
 51
 Defendants' fifth claim is that the district court erred by not excluding certain testimony allegedly obtained by the government in violation of 18 U.S.C. § 201(c)(2). We review a district court's decision to admit or exclude evidence for abuse of discretion. See United States v. Alatorre, 222 F.3d 1098, 1100 (9th Cir. 2000).
 
 
 52
 Section 201(c)(2) makes it a criminal offense to give, offer, or promise anything of value to any person in exchange for that person's testimony at trial.[15] Defendants argue that the government violated § 201(c)(2) by giving value — plea agreements, promises of leniency, and its discretion not to prosecute — in exchange for testimony from the four cooperating co-conspirator witnesses. In particular, Defendants focus on the government's treatment of Teresa Eames. Defendants argue that Ms. Eames was given (1) plea agreements in two cases against her, (2) various promises related to her sentencing, and (3) was not prosecuted or charged after she committed perjury during the trial[16] — all in exchange for her testimony. According to Defendants, in light of these § 201(c)(2) violations the district court should have excluded the testimony of the four cooperating co-conspirators, and it abused its discretion by not doing so.
 
 
 53
 Defendants' argument is without merit, given our decision in United States v. Smith, 196 F.3d 1034 (9th Cir.1999). In Smith, we held that even if a defendant shows that the government violated § 201(c)(2), "the appropriate manner to enforce the statute would be to prosecute the prosecutors who granted immunity to [the cooperating witness]. It would not be to exclude [the cooperating witness'] testimony."[17] Id. at 1040. Thus, even if we were to accept Defendants' suggestion that the government violated § 201(c)(2) in this case, the district court did not abuse its discretion by refusing to exclude the testimony of the cooperating witnesses.
 
 
 54
 Defendants attempt to avoid the result mandated by Smith by attacking our reasoning in that case. Specifically, Defendants contend that the cases we relied upon in reaching our holding in Smith did not support our decision. We decline to consider such arguments, as, absent intervening Supreme Court authority, "one three-judge panel of this court cannot reconsider or overrule the decision of a prior panel." United States v. Gay, 967 F.2d 322, 327 (9th Cir.), cert. denied, 506 U.S. 929, 113 S.Ct. 359, 121 L.Ed.2d 272 (1992).
 
 
 F. Materiality Instruction
 
 
 55
 Defendants' sixth claim is that the lower court erred in instructing the jury on the materiality element of the various mail and wire fraud counts. According to Defendants, the district court's instruction on materiality, taken verbatim from Instruction 8.26.1 of the NINTH CIRCUIT MANUAL OF MODEL JURY INSTRUCTIONS (1997 edition),[18] misstated the standard for determining whether an alleged misrepresentation is material. Because Defendants did not object to the instruction at trial, we review for plain error.[19] See FED. R. CRIM. P. 52(b); Jones v. United States, 527 U.S. 373, 388, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1998). A jury instruction is plainly erroneous if it is (1) erroneous, (2) the error is plain, and (3) the error affects substantial rights. See Jones, 527 U.S. at 389, 119 S.Ct. 2090. We will not exercise our discretion to correct a plainly erroneous instruction unless the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. (quoting Olano, 507 U.S. at 732, 113 S.Ct. 1770) (internal quotation marks omitted).
 
 
 56
 Though we set it forth to clarify our standard of review, we need not go through each step of the plain error analysis here, given our decision in United States v. Tam, 240 F.3d 797 (9th Cir.2001). In Tam, as in this case, it was argued that Instruction 8.26.1 was plainly erroneous because it inadequately defined the element of materiality. See id. at 802-03. We rejected this contention, holding that Instruction 8.26.1 is sufficiently similar to the Supreme Court's definition of materiality in United States v. Gaudin,[20] 515 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), to survive plain error review.[21] See id. at 803. In light of this holding, Defendants' attack on the district court's materiality instruction is without merit.
 
 
 G. Application of § 2S1.1
 
 
 57
 The final claim raised unanimously by Defendants is that the district court erred in setting the total offense level under the Sentencing Guidelines. Specifically, Defendants claim that the court should not have used § 2S1.1, the money laundering guideline, in calculating the total offense level. See U.S. SENTENCING GUIDELINES § 2S1.1 (1998). A district court's application and interpretation of the Sentencing Guidelines is reviewed de novo. See United States v. Newland, 116 F.3d 400, 402 (9th Cir.1997).
 
 
 58
 As we have previously noted, Appendix A of the Guidelines provides that the use of § 2S1.1 is appropriate in cases, such as this one, that involve convictions under 18 U.S.C. § 1956. See United States v. Lomow, 266 F.3d 1013, 1018 (9th Cir.2001). Nonetheless, citing to the Third Circuit's decision in United States v. Smith, 186 F.3d 290(3rd Cir.1999), superseded by rules as stated in Unites States v. Diaz, 245 F.3d 294 (3rd Cir.2001), Defendants argue that § 2S1.1 was wrongly applied to this case. In Smith, the Third Circuit held that § 2S1.1 should not be applied in cases where the money laundering is an "incidental by-product" of some underlying offense. See Smith, 186 F.3d at 300 (stating that the "heartland" of § 2S1.1 is money laundering involving serious criminal conduct, such as drug trafficking or organized crime, and that application of the section should be limited to that type of conduct). According to Defendants, Smith establishes that they should not have been sentenced under § 2S1.1, as their alleged money laundering activities were merely incidental to the alleged primary criminal conduct, which they characterize as simple fraud.
 
 
 59
 We cannot accept Defendants' argument, as recent developments in the law bar their claim. With our decision in Lomow, filed after the briefs were submitted in this case, we expressly rejected the reasoning in Smith.[22] See Lomow, 266 F.3d at 1018-19. In Lomow we noted that, since Smith, the Sentencing Guidelines have been amended to clarify[23] that courts should deviate from the offense level provided by Appendix A only in cases involving the "stipulation exception" in § 1B1.2(a), which does not apply here.[24] See id. Thus, because § 2S1.1 is the guideline designated in Appendix A for convictions under 18 U.S.C. § 1956, and because the stipulation exception is not applicable, the district court did not commit error in using § 2S1.1 to calculate Defendants' sentences.
 
 
 60
 II. Reloaders' Challenge to the Sufficiency of the Evidence
 
 
 61
 Reloaders claim that the evidence on each count was insufficient to convict them at the close of the government's case, and thus that the trial court erred by denying their motions for acquittal. See FED. R. CRIM. P. 29. We will reverse a district court's finding of sufficient evidence, and thereby its denial of a Rule 29 motion for acquittal, only if viewing the evidence in the light most favorable to the government, and granting to the government all reasonable inferences that may be drawn from the evidence, no rational trier of fact could find beyond a reasonable doubt that the defendant committed the crime. See United States v. Alexander, 48 F.3d 1477, 1490 (9th Cir.1995). Because, applying this standard, we conclude that there was sufficient evidence at the close of the government's case to sustain Reloaders' convictions, we affirm the district court's denial of the Rule 29 motions.[25]
 
 
 A. The Conspiracy Counts
 
 
 62
 As noted at the beginning of this opinion, Reloaders were convicted of both conspiracy to commit promotional money laundering[26] and conspiracy to commit wire/mail fraud. Generally, to justify a conviction for conspiracy the government must establish (1) an agreement to engage in criminal activity, (2) one or more overt acts taken to implement the agreement, and (3) the requisite intent to commit the substantive crime. See United States v. Nelson, 66 F.3d 1036, 1044 (9th Cir.1995). However, if the existence of a conspiracy is shown, "evidence establishing beyond a reasonable doubt a knowing connection of the defendant with the conspiracy, even though the connection is slight," is sufficient to support a conviction. See United States v. Meyers, 847 F.2d 1408, 1413 (9th Cir.1988); United States v. Messer, 197 F.3d 330, 341 (9th Cir.1999).
 
 
 63
 The evidence against Reloaders, though not overwhelming, was sufficient to support their convictions on the two conspiracy counts. The government established, with evidence fully admissible against Reloaders, that Rashada and Rudisill were engaged in conspiracies to commit fraud and promotional money laundering.[27] The testimony of Rashada, Simone, and the various testifying victims showed that Rashada and Rudisill agreed to telemarket ad specialty products to elderly consumers made up to look like businesses. They expressly agreed to use the proceeds of their sales to fund the operation. To identify the individuals to which they could sell their products, Rashada and Rudisill created a qualifying pitch full of lies.[28] In order to convince qualified individuals to buy AEA's products, Rashada and Rudisill also created a front pitch and a reload pitch replete with misrepresentations.[29] They hired employees, trained them on how to use these pitches, and put them to work on calling individuals. All funds taken in from this scheme were in the form of checks. These checks were directed to Phoenix, where Rudisill and Rashada intended they be cashed and used to pay the bills for the Atlanta operation — including Atlanta's payroll. Collectively, this evidence established that Rashada and Rudisill were engaged in both a conspiracy to fraudulently induce people to mail in money, and a conspiracy to engage in financial transactions (check cashing) with the proceeds of the fraud to fund additional fraud.
 
 
 64
 The government also sufficiently established that Reloaders had a knowing connection to both conspiracies. Rashada testified that Reloaders made qualifying, front, and reload calls during their tenure at AEA. These calls connected Reloaders to both conspiracies because they were the means by which AEA fraudulently induced individuals to mail in money, and the source of the illicit monies used to finance the on-going operation.
 
 
 65
 Moreover, circumstantial evidence showed that Reloaders possessed knowledge of the conspiracies. Part of this circumstantial evidence was provided by Rashada's and Simone's testimony on the day-to-day operations of AEA. All the telemarketers at AEA used aliases during their calls. They were taught to convince customers to adopt business names before each sale, and every customer was given the same reward claim number. In filling out sales orders, they were told to record the customer's phone number in code, and to list as the sale price an amount equal to ten percent of the actual sale price. There was no filing system on site for the storage of records. There were no computers in the office (other than Rudisill's personal laptop), and, with the exception of a receptionist, there was no support staff. Every night, before closing, the sales staff was required to load all pitch books, sales orders, and other evidence of the office's daily activities into a box, which Rudisill took home with him. Each employee was paid strictly in cash on every Friday. Virtually every customer contacted by the Atlanta office was an elderly individual. Finally, the very nature of the work at AEA was suspect. Some of the customers were reloaded over ten times. At some point, Reloaders must have wondered why customers had to keep sending in money to receive the prizes promised in the initial sales call. Even the most obtuse observer could not help but be suspicious in such an environment.
 
 
 66
 Additional evidence at trial strengthened the inference that Reloaders knew about AEA's illegal activities. Under the supervision of Rashada and Rudisill, Reloaders made hundreds of calls while employed at AEA. Some of the representations made in these calls would have been obviously false to the person making the call — for example, as to qualifying calls, the claim that the person had been selected pursuant to their entry in a national sweepstakes (the names were taken directly off a leads sheet), and the claim that the caller would be submitting the customer's name to an executive committee (no such committee existed). Other representations, if not facially dishonest, would become patently false after a certain number of calls. After all, only so many people can be one of the lucky "few" entitled to a share in $500,000 of gold coins. In light of these obvious misrepresentations, taken from sales materials provided by Rashada and Rudisill, a jury could have found that Reloaders knew that they were perpetuating a fraudulent scheme. Moreover, it is reasonable to infer from the evidence that Reloaders knew other employees at AEA were a part of this scheme. Both Rashada and Simone testified that Reloaders engaged in daily sales meetings with Rudisill, could overhear each other's calls, and regularly worked together on getting reloaded customers to send in additional checks.
 
 
 67
 Given the suspicious nature of the operation at AEA, the fact that Reloaders knowingly made false statements to individuals to get them to send in money, and the fact that fraud permeated the Atlanta office, we conclude that a rational juror could have found Reloaders guilty of conspiracy to commit fraud beyond a reasonable doubt. In light of the fact that Reloaders knew that all checks garnered by their fraudulent calls went to Phoenix, that these checks were cashed, and that funds from Phoenix were used to cover expenses and payroll for the Atlanta office,[30] we also hold that there was enough evidence for a rational juror to have found Reloaders guilty beyond a reasonable doubt of conspiracy to commit promotional money laundering. Therefore, we affirm the district court's decision on Reloaders' Rule 29 motion as to these two counts.
 
 
 B. The Fraud Counts
 
 
 68
 Generally, to obtain a conviction for wire or mail fraud, the government must prove that the defendant (1) participated in a scheme with intent to defraud, and (2) the scheme used or caused the use of the mails or wire in furtherance of the scheme. See United States v. Ciccone, 219 F.3d 1078, 1083-84 (9th Cir.2000); United States v. Lothian, 976 F.2d 1257, 1262 (9th Cir.1992). "The defendant need not personally have mailed the letter or made the telephone call; the offense may be established where one acts with the knowledge that the prohibited actions will follow in the ordinary course of business or where the prohibited acts can reasonably be foreseen." Lothian, 976 F.2d at 1262.
 
 
 69
 Reviewing the record, we conclude that the government presented enough evidence to convict each reloader for each substantive count. The evidence discussed in the preceding section showed that all four reloaders participated in a scheme with intent to defraud. They regularly made representations over the telephone in order to get individuals to mail checks to the company, all the while knowing that the representations were fraudulent. They also knew they were acting as part of a group, given the joint training sessions, daily sales meetings, the fact that they shared customers, and the fact that they could overhear each other's calls. Finally, circumstantial evidence established that Reloaders were willing participants in the scheme. Each worked for the company for a significant amount of time, and each accepted the financial benefits of AEA's success.
 
 
 70
 Moreover, for each count, the government presented sufficient evidence of the use of wire or mail in furtherance of the fraud scheme. For example, as to count 2, victim Drusilla Aden testified that she sent AEA $16,000 via United Parcel Service ("UPS") after receiving a phone call from a H.P. Wills (an alias used by Davis). In support of count 8, Juanita Easson stated that she sent $2,500 to AEA via the postal service after receiving a call from John Logan (one of Burce's aliases). For count 12, Mary Jane Karpel testified that she sent AEA $50,000 via UPS following a phone conversation with John Foley (another one of Burce's aliases). For the various wire fraud counts, the government presented testimony from a phone company representative showing that AEA made calls to various victims immediately prior to the victim's transmittal of a check to AEA.
 
 
 71
 It is immaterial that the government did not prove that each reloader engaged in conduct directly relevant to each fraud count. Much like co-conspirators, knowing participants in a mail or wire fraud scheme are liable for their co-schemers' use of the mails or wires. See Lothian, 976 F.2d at 1263. Thus, for each count, it was sufficient for the government to show that Reloaders participated in the scheme, and that some co-participant used or caused to be used mail or wire in furtherance of the scheme.[31]
 
 
 72
 Because the government presented sufficient evidence to convict at least one reloader as to each substantive offense, and because each substantive act of telemarketing fraud was foreseeable and in furtherance of AEA's telemarketing scheme, we hold that a rational juror could find Reloaders guilty beyond a reasonable doubt on the various fraud counts. Therefore, the district court's denial of Reloaders' motion for acquittal on these counts is affirmed.[32]
 
 III. Managers' Challenge to Restitution
 
 73
 Managers claim that the district court erred in ordering each to pay nearly $8.7 million in restitution to victims. According to Managers, the court below should have declined to order restitution, given each man's inability to pay. Challenges to the legality of a sentence are reviewed de novo. See United States v. DeSalvo, 41 F.3d 505, 511 (9th Cir.1994).
 
 
 74
 Managers' challenge to the district court's restitution order is frivolous. Title 18 U.S.C. § 2327 states that a court shall order full restitution to all victims in cases involving wire fraud, mail fraud, or conspiracy to commit such fraud, if the offense is committed in connection with telemarketing. See 18 U.S.C. § 2327(a).[33] Section 2327 makes clear that such an order is mandatory, and that a court may not decline to issue the order "because of the economic circumstances of the defendant." 18 U.S.C. § 2327(b)(4).[34] Because this case involved wire and mail fraud in connection with telemarketing, and because an order of restitution to victims is mandatory in such cases — regardless of a defendant's ability to pay — the district court was correct to order Managers to pay restitution to their victims.
 
 IV. Challenges Raised by Johnson
 
 75
 
 A. Reduction Under § 2X1.1 for Incomplete Conspiracy
 
 
 
 76
 Johnson first argues that the district court erred in calculating his offense level for conspiracy to commit promotional money laundering. According to Johnson, the court failed to give him a three-level reduction to which he was entitled under Guideline § 2X1.1(b)(2). See U.S. SENTENCING GUIDELINES MANUAL § 2X1.1(b)(2) (1998). Whether a reduction under § 2X1.1(b)(2) is warranted by the facts is reviewed for clear error. See United States v. Martinez-Martinez, 156 F.3d 936, 939 (9th Cir.1998).
 
 
 77
 Along with the other five defendants, Johnson was convicted of conspiracy to commit promotional money laundering. Section 2X1.1(a), which sets the offense level for conspiracy, provides that the base offense level for conspiracy is generally the same as the base offense level for the underlying substantive crime. However, under § 2X1.1(b)(2),[35] a defendant convicted of conspiracy is entitled to a three-level reduction if the substantive offense that he conspired to commit was not substantially completed (unless the failure to complete is the result of an unavoidable interruption, an exception not at issue in this case). According to Johnson, in light of § 2X1.1(b)(2), he is entitled to a three-level reduction because he, individually, never completed the substantive crime of promotional money laundering.
 
 
 78
 Johnson's argument is unpersuasive. It is likely that Johnson alone never completed the substantive crime of promotional money laundering, as there is no indication in the record that he ever engaged in a financial transaction for the purpose of promoting additional criminal activity. However, Johnson's failure to complete the substantive crime is not enough to warrant a three-level reduction. To obtain a § 2X1.1(b)(2) reduction, Johnson must also show that none of his co-conspirators completed the crime of promotional money laundering. See U.S. SENTENCING GUIDELINES MANUAL § 2X1.1(b)(2) (1998). Given that Eames and Rudisill were convicted on eleven counts of the substantive promotional money laundering, Johnson cannot meet this burden. As such, Johnson was not entitled to a three-level reduction under § 2X1.1(b)(2), and the district court did not err in refusing to grant this reduction.
 
 
 B. Vulnerable Victim Enhancement
 
 
 79
 Johnson next argues that, because money laundering is a victimless crime, the trial court erred in applying the vulnerable victim enhancement of § 3A1.1(b) to his group for conspiracy to commit promotional money laundering. See U.S. SENTENCING GUIDELINES MANUAL § 3A1.1(b) (1998). In addition, Johnson claims that the court improperly double-counted the vulnerable victim enhancement by applying it to both the fraud group and the group for conspiracy to commit promotional money laundering. As these claims involve the district court's interpretation and application of the Guidelines, we apply de novo review. See United States v. Montano, 250 F.3d 709, 712 (9th Cir.2001).
 
 
 80
 Under our decision in United States v. Calozza, 125 F.3d 687 (9th Cir.1997), the vulnerable victim enhancement of § 3A1.1(b)[36] applies whenever the offense of conviction involved "relevant conduct" that victimized a person that the defendant knew or should have known was vulnerable. See id. at 691; see also U.S. SENTENCING GUIDELINES MANUAL § 3A1.1(b) (1998). The Guidelines define as relevant conduct "all acts ... that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S. SENTENCING GUIDELINES MANUAL § 1B1.3(a) (1998).
 
 
 81
 Applying these principles to the instant case, we conclude that the district court was correct to add a vulnerable victim enhancement to the group for conspiracy to commit promotional money laundering. It is undisputed that the victims in this case were vulnerable, and that Johnson, in his capacity as a "front man," knew or should have known of this vulnerability. Moreover, it is clear that conduct relevant to Johnson's crime of conspiracy to commit promotional money laundering victimized these vulnerable persons. In committing the crime of conspiracy to commit promotional money laundering, Johnson engaged in overt acts in the form of wire fraud and mail fraud, which provided the illicit funds necessary to finance additional criminal activity. These acts of fraud involved vulnerable victims. Therefore, the district court was correct to apply the vulnerable victim enhancement to Johnson's group for conspiracy to commit promotional money laundering.
 
 
 82
 Additionally, we find no error in the district court's application of the vulnerable victim enhancement to both the fraud group and the conspiracy to commit promotional money laundering group. While the Presentence Report indicates that the vulnerable victim enhancement was used in calculating the base offense level for both groups, this was done simply to determine which group provided the higher base level offense, as allowed by Calozza. See 125 F.3d at 690. Once the conspiracy group was selected, the district court dropped the two-level enhancement from the fraud group before computing the total offense level, as required by Calozza. See id. at 692. Thus, no double counting occurred, and Johnson's claim in this regard is meritless.
 
 
 C. Minimal Participant Adjustment
 
 
 83
 Johnson's third argument is that the district court erred by not reducing his offense level under § 3B1.2(a) to reflect his role as a minimal participant in the conspiracy to commit promotional money laundering. We review for clear error a district court's determination that a defendant does not qualify for minimal participant status. See United States v. Davis, 36 F.3d 1424, 1436 (9th Cir.1994).
 
 
 84
 The Guidelines provide for a four-level downward adjustment if the defendant is a "minimal participant" in the offense. See U.S. SENTENCING GUIDELINES MANUAL § 3B1.2(a) (1998). The notes to § 3B1.2 indicate that a minimal participant is one who is clearly among the least culpable in a criminal group. See U.S. SENTENCING GUIDELINES MANUAL § 3B1.2(a), cmt. n. 1 (1998). Clarifying this rule, we have held that a defendant's culpability is to be measured against his co-participants, not a hypothetical "average participant." See United States v. Petti, 973 F.2d 1441, 1447 (9th Cir.1992). Finally, even if a defendant establishes that he was among the least culpable of the group, a downward adjustment under § 3B1.2(a) is appropriate only if the defendant was at least "substantially" less culpable than his co-participants. See United States v. Benitez, 34 F.3d 1489, 1498 (9th Cir.1994).[37]
 
 
 85
 In support of his claim that he was only a minimal participant in the conspiracy to commit promotional money laundering, Johnson points to the fact that he did not engage in the financial transactions that completed the substantive offense of money laundering. In addition, Johnson notes that he did not work at AEA for the entire duration of the scheme. While the criminal activity in this matter ran from January of 1996 until June of 1997, Johnson worked at AEA from January through March of 1996, and again in late 1996 and the spring of 1997.
 
 
 86
 Johnson's argument fails to persuade. It is true that Johnson spent less time at AEA than the other reloaders, and that he was less directly involved in the actual money laundering than Eames or Rudisill. Thus, it may be fairly said that Johnson was the least culpable participant in the scheme at AEA. However, it is also true that Johnson was actively involved in the scheme for a substantial amount of time, and that his efforts as both a front man and reloader contributed significantly to the procurement of funds that were used to perpetuate AEA's illegal activities. Indeed, the record indicates that Johnson's efforts were uniquely instrumental, among the reloaders, in getting the scheme off the ground. He was the best front man in the early days of the operation, and was rewarded for his contribution by being the first sales person to receive a promotion to reloader. Under these circumstances, we cannot say with a definite and firm conviction that the district court erred in failing to find Johnson "substantially" less culpable than his co-participants. See United States v. Maldonado, 215 F.3d 1046, 1050 (9th Cir.2000) (stating that a decision is clearly erroneous only if it leaves us with a definite and firm conviction that a mistake has been made). Therefore, we decline to disturb the district court's decision regarding Johnson's "minimal participant" status.
 
 
 D. Criminal History Enhancement
 
 
 87
 Finally, Johnson argues that the trial court improperly increased his offense level for conspiracy by considering a criminal justice sentence that occurred after the conclusion of the offense. We review de novo a district court's determination that a prior conviction is within the scope of the Guidelines. See United States v. Davis, 932 F.2d 752, 763(9th Cir.1991).
 
 
 88
 The Guidelines provide for a two-point enhancement to a defendant's offense level if any part of the "instant offense" is committed while the defendant is under any criminal justice sentence, including parole. See U.S. SENTENCING GUIDELINES MANUAL § 4A1.1(d), cmt. n. 4 (1998). In addition, the Guidelines require a one-point enhancement if any part of the "instant offense" takes place within less than two years following the defendant's release from imprisonment. See U.S. SENTENCING GUIDELINES MANUAL § 4A1.1(e), cmt. n. 5 (1998).
 
 
 89
 Considering these principles and the facts of this case, we conclude that the district court correctly enhanced Johnson's offense level under § 4A1.1(d)-(e). In May of 1996—five months after he joined AEA—Johnson's probation on an earlier conviction was revoked, and he was given a two-year sentence. He was released from this sentence, on parole, in November of 1996. At that time, he returned to work in AEA's Atlanta office. Johnson argues that, because he did not engage in any reloading activities after his return, no part of his offense of conspiring to commit promotional money laundering occurred after the May, 1996 sentence and prison time, and the district court should not have considered that sentence in determining the offense level. This argument fails because it ignores other activities in which Johnson engaged upon his return to AEA.
 
 
 90
 Though Johnson did not work as a reloader after November of 1996, he continued to provide services as a "front man." In this capacity, Johnson qualified potential victims for AEA, and thus assisted in obtaining the funds by which the illegal scheme was perpetuated. Therefore, it is clear that Johnson engaged in conduct relevant to the conspiracy to commit promotional money laundering upon his return to AEA. Because these post-November 1996 activities were part of the "instant offense," and because they were committed both while Johnson was on parole and within two years of his release from imprisonment, the district court was correct to enhance his sentence under § 4A1.1(d)-(e).
 
 V. Conclusion
 
 91
 We conclude that Defendants' convictions and sentences are without error.
 
 
 92
 AFFIRMED.
 
 APPENDIX "A"
 
 93
 21. On or about the following dates, in the District of Arizona and elsewhere, the defendants did, for the purpose of executing the scheme and artifice to defraud, knowingly transmit or cause to be transmitted, by means of wire communications in interstate commerce, certain signals and sounds (i.e. long-distance telephone calls between Georgia and Arizona and other states) as follows:
 
 
 94
 COUNT DATES VICTIM CALL FROM CALL TO
 (ON OR ABOUT) CUSTOMER

 21 1/8/96 Druscilla Aden Phoenix, Arizona Northbrook,
 Illinois

 22 6/19/96 Martha & Larry Chamblee, San Antonio,
 Biggs Georgia Texas

 23 6/19/96 Martha & Larry San Antonio, Phoenix, Arizona
 Biggs Texas

 24 4/9/96 Joseph Frederick North Versailles, Phoenix, Arizona
 Pennsylvania

 25 4/30/96 Joseph Frederick Chamblee, North Versailles,
 Georgia Pennsylvania

 26 4/9/96 Juanita Easson Chamblee, Franklin,
 Georgia Tennessee

 27 4/11/96 Juanita Easson Chamblee, Franklin,
 Georgia Tennessee

 28 1/9/96 Alice & Wilbur Chamblee, West Greenwich,
 Jordan Georgia Rhode Island

 29 1/11/96 Alice & Wilbur Phoenix, Arizona West Greenwich,
 Jordan Rhode Island

 30 9/24/96 Mary Jane Karpel Chamblee, Castro Valley,
 Georgia California

 31 10/18/96 Mary Jane Karpel Chamblee, Castro Valley,
 Georgia California

 32 1/10/96 Carston Reese Chamblee, Austin, Nevada
 Georgia

 33 1/19/96 Carston Reese Phoenix, Arizona Austin, Nevada
 
 
 95
 In violation of Title 18, United States Code, Sections 1343 and 2.
 
 
 
 Notes:
 
 
 [1]
 In the context of this appeal, "reloading" refers to a particular type of telemarketing pitch, discussed below. Burce, Davis, Clark, and Johnson delivered several types of pitches while at AEA, including a front pitch and a qualifying pitch (also discussed below). However, because they were most actively involved in the reload pitch, we refer to them collectively as "Reloaders" in this opinion
 
 
 [2]
 Specifically, the district court told the jury "not to assume that any of the defendants knew that the leads ... were stolen."
 
 
 [3]
 The limiting instruction for each conversation generally told the jury that it could consider the conversation only as it related to Eames
 
 
 [4]
 Rudisill also suggests in his brief that he suffered prejudice from joinder with Eames because he was unable to cross-examine Eames on the statements made in the four conversationsSee United States v. Mayfield, 189 F.3d 895, 901 (9th Cir.1999) (noting that a violation of the right to cross-examination, which is protected by the Sixth Amendment's Confrontation Clause, "can require a court to sever trials"). We disagree. Because the district court provided instructions limiting the first three conversations to Eames, and because none of the conversations involved a confession of guilt implicating Rudisill, Eames was not a witness against Rudisill in those conversations, and Rudisill had no right to cross-examine Eames about those conversations. See Richardson v. Marsh, 481 U.S. 200, 206, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) (stating that "a witness whose testimony is introduced at a joint trial is not considered to be a witness `against' a defendant if the jury is instructed to consider that testimony only against a codefendant"); see also Bruton v. United States, 391 U.S. 123, 137, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (holding that if a codefendant's confession of guilt implicates the other codefendants, admission of that confession without cross-examination violates the Confrontation Clause rights of the non-confessing codefendants, even if an appropriate limiting instruction is provided). Assuming there was a Confrontation Clause violation as to the "blood money" conversation, we conclude that the error was harmless beyond a reasonable doubt for the same reason we find non-prejudicial the fact that it was admitted. See United States v. Vargas, 933 F.2d 701, 704 (9th Cir.1991) ("A violation of the confrontation clause, including a violation of the defendant's right to cross-examine and impeach a witness, is subject to harmless error analysis").
 
 
 [5]
 A fourth possible claim, not fully developed in the briefs, is that Reloaders suffered prejudice from joinder because joinder prevented them from full cross-examination of Ricardo Simone, a government witness and former AEA employeeSee United States v. Mayfield, 189 F.3d 895, 901 (9th Cir.1999) (noting that violations of the right to cross-examination may require severance).
 Simone was indicted for engaging in fraudulent telemarketing activities with Eames, Rudisill, and Ms. Eames (this constituted the second indictment against the latter three). Simone entered a plea agreement on the charges stemming from this "second" indictment, and evidence of this plea agreement was introduced during the trial. In an effort to protect the rights of Eames and Rudisill, the district court prohibited discussion of the facts underlying this plea, and instructed the jury that the plea could be used only for impeachment of Simone. According to Reloaders, this prevented them from engaging in a full cross-examination of Simone, which amounted to a violation of their Sixth Amendment right to confrontation and deprived them of a fair trial.
 Reloaders' claim fails because the record indicates that they were able to significantly cross-examine Simone about his plea agreement, and indeed succeeded in calling into question his credibility. Given Reloaders' ability and success at impeaching Simone's testimony, any Confrontation Clause violation stemming from the limits on cross-examination was harmless beyond a reasonable doubt and therefore did not manifestly prejudice Reloaders. See United States v. Vargas, 933 F.2d 701, 704 (9th Cir.1991) (stating that violations of the right to cross-examine and impeach a witness are subject to harmless error analysis).
 
 
 [6]
 Rashada stated that HBO used a mystery pitch in selling to customers. A mystery pitch involves calling a potential customer and telling him that he will receive a mystery award if he purchases a product. While no doubt such a pitch may be used in a fraudulent manner (for example, if the putative award offered to the customer does not actually exist), there was no indication at trial that HBO used the mystery pitch in such a fashion
 
 
 [7]
 Reloaders seem to suggest that Managers' evidence at trial that they were legitimate businessmen was somehow in conflict with their defense. In support of this claim, they point to Managers' evidence suggesting that Managers (1) believed AEA was a legitimate operation; (2) regularly provided refunds to complaining customers; (3) circulated several memos warning employees of possible termination and criminal prosecution for engaging in fraud; (4) hired several investigators and lawyers, including a former United States Attorney, to verify that their operation was legitimate and to assist them in drafting a sales pitch; and (5) donated several thousand dollars to charity. Because we fail to see how evidence of a defendant's good character necessarily leads to the conclusion that a codefendant is guilty, we dismiss this argument as meritless
 
 
 [8]
 This district court's handling of the limiting instructions provided clear guidance during trial, and its lifting of the instructions at the end of the trial left the jury with few limiting instructions to consider, and clear directions on how those should be applied. As such, there is little to commend Defendants' claim that there were too many instructions at trial, and that the disappearance of the instructions at the close of the proceedings confused the jury
 
 
 [9]
 Defendants attempt to bolster their argument by claiming that the evidence was insufficient to convict each defendant on each fraud count, citing to the fact that there was no direct evidence linking some of the defendants to certain fraud counts. In Defendants' view, the absence of evidence to convict on these counts indicates that something else must have compelled the jury to reach its unanimous result — namely, confusion from the complexity of the trial
 Defendants' argument fails to appreciate that under the law of fraud schemes, each co-schemer may be held vicariously liable for a co-schemers reasonably foreseeable use of mail or wire in furtherance of the scheme. See United States v. Lothian, 976 F.2d 1257, 1263 (9th Cir.1992). Under this rule, if the jury found each defendant guilty of participation in the scheme, and that a co-schemer had used mail or wire in furtherance of the scheme in a particular count, it could lawfully impose liability for that count on each defendant, regardless of the direct evidence of culpability. Because, as discussed below, we believe there was sufficient evidence to establish that each defendant knowingly participated in the scheme, as well as sufficient evidence establishing a co-schemer's use of mail or wire in furtherance of the scheme for each fraud count, we conclude that the evidence in this case was the basis of the jury's decision to convict Defendants on all counts against them, not juror confusion.
 
 
 [10]
 Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." FED. R. EVID. 801
 
 
 [11]
 Rule 803(6) states the following is excluded from the hearsay rule:
 A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.
 
 
 [12]
 The checks were copies of checks that had been deposited into AEA's bank accounts. The payor, or, for cashier's checks, the purchaser listed on each check was a person who had been identified as a customer of AEA's Atlanta office. The bank records were deposit slips reflecting that the checks had been deposited into AEA's business accounts in Phoenix
 
 
 [13]
 It is clear from the record that the Atlanta office made money strictly by fraud because every sale in that office initiated with the same fraudulent qualifying pitch. The details of this fraudulent pitch are set forth below in our discussion of the sufficiency of the evidence
 
 
 [14]
 Defendants combine their attack on the admission of the sales orders, tapes, checks, and bank records with a general claim that each of these items violated their rights to cross-examination under the Confrontation Clause. Because, to the extent they contained any hearsay, the sales orders, tapes, and bank records fell within the business records exception, none of these pieces of evidence violated the Confrontation ClauseSee United States v. Miller, 830 F.2d 1073, 1077 (9th Cir.1987) (stating that "[f]irmly-rooted exceptions to the hearsay rule do not offend the Confrontation Clause"). Regarding the checks, for the reasons noted in the text, any Confrontation Clause violation stemming from their admission was harmless beyond a reasonable doubt. See Ortega, 203 F.3d at 682 (noting that Confrontation Clause violations are subject to harmless error analysis).
 
 
 [15]
 Section 201(c)(2) states in its entirety:
 Whoever, directly or indirectly, gives, offers, or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court, any committee of either House or both Houses of Congress, or any agency, commission, or officer authorized by the laws of the United States to hear evidence or take testimony, or for or because of such person's absence therefrom; shall be fined under this title or imprisoned for not more than two years, or both.
 
 
 [16]
 Ms. Eames lied about having a drink prior to her testimony
 
 
 [17]
 Smith created a possible exception for cases in which the government's violation of § 201(c)(2) amounts to a violation of the defendant's constitutional rights. See id. at 1040. We need not consider this possible exception here, as Defendants do not argue that their constitutional rights were offended by the government's alleged violation of § 201(c)(2).
 
 
 [18]
 Instruction 8.26.1 of the 1997 edition defined as material "promises or statements ... that would reasonably influence a person to part with money or property." The 2000 edition's definition of materiality, for purposes of wire and mail fraud, is essentially the sameSee NINTH CIRCUIT MANUAL OF MODEL JURY INSTRUCTIONS, Instruction 8.101 (2000 edition).
 
 
 [19]
 Defendants did propose an alternative instruction on materiality before the jury retired. However, under Supreme Court precedent, "a request for an instruction before the jury retires [does not] preserve an objection to the instruction actually given by the court."Jones v. United States, 527 U.S. 373, 388, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1998).
 
 
 [20]
 UnderGaudin, a false statement is material if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." Gaudin, 515 U.S. at 509, 115 S.Ct. 2310 (quoting Kungys v. United States, 485 U.S. 759, 770, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988)) (internal quotation marks omitted).
 
 
 [21]
 Defendants suggest thatGaudin no longer provides the correct definition of materiality. In their view, the Supreme Court adopted a new definition of materiality, the one presented in Restatement (Second) of Torts § 538, with its decision in Neder v. United States, 527 U.S. 1, 22 n. 5, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (noting that the Restatement describes a matter as material if "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action" or "the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important"). We disagree. At no point in the relevant passage from Neder did the Court indicate that it was abandoning Gaudin or adopting the Restatement's view as the exclusive definition of materiality. Indeed, in an earlier passage in Neder, the Court favorably cited Gaudin as providing the general definition of materiality. See Neder, 527 U.S. at 16, 119 S.Ct. 1827. Therefore, at most, Neder stands for the proposition that alternative meanings of materiality are permissible. Because Gaudin is one such permissible alternative, and because Instruction 8.26.1 is substantially similar to it, the instruction in this case was not plainly erroneous. See Tam, 240 F.3d at 802-03.
 
 
 [22]
 The Third Circuit has rejected the reasoning of its decision inSmith. See United States v. Diaz, 245 F.3d 294, 303 (3d Cir.2001) (holding that Smith "is no longer good law").
 
 
 [23]
 Because the change was clarifying, rather than substantive, it presents no ex post facto issue, even though it was made following Defendants' sentencing in this caseSee Lomow, 266 F.3d at 1019 n. 3.
 
 
 [24]
 The stipulation exception provides that, in the case of a plea agreement containing a stipulation that establishes a more serious offense than the offense of conviction, the guideline section applicable to the stipulated offense may be used in place of the section designated in Appendix A for the offense of conviction. No plea agreements were entered in this case
 
 
 [25]
 In reaching our decision, and in the discussion below, we assume, without deciding, that Reloaders are correct in arguing that we are to base our decision on the evidence as it stood at the close of the government's case, complete with the various limiting instructions that were in place at that time
 
 
 [26]
 A party commits the substantive crime of promotional money laundering, as it pertains to this appeal, if he (1) engages in a financial transaction, (2) that he knows involves the proceeds of unlawful activity, (3) with the intent to promote unlawful activitySee 18 U.S.C. § 1956(a)(1)(A)(i).
 
 
 [27]
 The evidence also established that Eames was a partner in these conspiracies. However, because Reloaders had only limited contact with Eames and the Phoenix office during their time at AEA, we direct our attention to the happenings in Atlanta
 
 
 [28]
 The qualifying pitch contained the following misrepresentations: customers were told that they had been selected as a finalist in AEA's promotion by virtue of having entered a national sweepstakes (everyone on the list of leads was told this, regardless of whether they had ever entered a national sweepstakes); customers were told they were being called from AEA's Rewards Center (the Atlanta office was strictly a boiler-room); customers were told they were speaking with a rewards coordinator (the telemarketers in Atlanta did nothing but sales); customers were told that there were only a few finalists (this was told to hundreds of people each week); and, after the qualifying information was obtained, customers were told that their entry would be considered by AEA's executive committee (no such committee existed-calling a customer back to make a sale was entirely within the telemarketer's discretion)
 
 
 [29]
 The front pitch contained the two following misrepresentations: customers were told that, in exchange for their purchase, they were guaranteed to receive a reward of significant value, which might include an automobile, a vacation, a home entertainment center, or a portfolio of gold (no such prizes existed); and customers were told that AEA sold only to businesses (all the leads in Atlanta were for individuals). The primary misrepresentations of the reload pitch were that (1) the prizes represented in the front pitch were liquidated and no longer available, and (2) the individual was guaranteed, along with only a few others, to receive their fair share of $500,000 in gold coins
 
 
 [30]
 Reloaders' actual knowledge that the checks were cashed was demonstrated through testimony on their multiple conversations with the reload victims. Reloaders' knowledge that the funds were used to finance the Atlanta operation could have been reasonably inferred from the fact that, although Atlanta had no accounting personnel, the lights and phones stayed on, and every week a shipment of cash arrived from Phoenix to cover payroll
 
 
 [31]
 In reaching our decision, we are mindful of the fact that Johnson was not present at AEA during the period in which several of the substantive fraud counts arose. However, Johnson's absence does not alter our opinion, as his contacts with AEA during his leave, when combined with his return to the company as a front salesman, show that he never withdrew from the scheme at AEASee Lothian, 976 F.2d at 1261(noting that to withdraw from a scheme, a defendant must either disavow the unlawful goal of the scheme, affirmatively act to defeat the purpose of the scheme, or take definite, decisive, and positive steps to show that the defendant's disassociation from the scheme is sufficient).
 
 
 [32]
 In their brief, Reloaders seem to argue that the evidence as to the conspiracy to commit promotional money laundering count and various fraud counts was also insufficient at the close of all evidence. Given that we believe the evidence on these counts was sufficient to sustain conviction at the close of the government's case, and that the evidence against Reloaders only increased by the close of all evidence (with the lifting of the various limiting instructions), we dismiss this argument as meritless
 
 
 [33]
 Section 2327(a) provides:
 Notwithstanding section 3663 or 3663A, and in addition to any other civil or criminal penalty authorized by law, the court shall order restitution to all victims of any offense for which an enhanced penalty is provided under section 2326.
 Section 2326 establishes enhanced penalties for, inter alia, 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1342 (wire fraud), and conspiracy to commit such frauds, in connection with the conduct of telemarketing. See 18 U.S.C. § 2326.
 
 
 [34]
 Section 2327(b)(4) provides:
 (4) Order Mandatory.
 (A) The issuance of a restitution order under this section is mandatory.
 (B) A court may not decline to issue an order under this section because of —
 (i) the economic circumstances of the defendant; or
 (ii) the fact that a victim has, or is entitled to, receive compensation for his or her injuries from the proceeds of insurance or any other source.
 
 
 [35]
 Section § 2X1.1(b)(2) states in relevant part:
 If a conspiracy, decrease by 3 levels, unless the defendant or a co-conspirator completed all the acts the conspirators believed necessary on their part for the successful completion of the substantive offense ....
 
 
 [36]
 Section 3A1.1(b) provides:
 If the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase [the offense level] by 2 levels.
 
 
 [37]
 We recognize thatBenitez was a "minor participant" case, not a "minimal participant" case. However, it stands to reason that if a minor participant must be substantially less culpable, a minimal participant must at least be substantially less culpable, given that a minimal participant is theoretically less culpable than a minor participant. See U.S. SENTENCING GUIDELINES MANUAL § 3B1.2, cmt. n. 1-3, (backg'd) (1998).